## JANSSEN *v.* MULDER.

1. MALPRACTICE—FAILURE OF CHIROPRACTOR TO REGISTER INSUFFICIENT—NEGLIGENCE MUST BE SHOWN.

> While failure of a chiropractor to register as a drugless healer, as required by 2 Comp. Laws 1915, § 6726, might subject him to criminal prosecution, such failure, coupled with a showing of treatment given, is not in itself sufficient on which to base an action for malpractice, but to maintain such action it must be shown that the result complained of was due to negligence or unskilful treatment.[1]

2. SAME—EVIDENCE—BURDEN OF PROOF.

> In an action against a graduate of a chiropractic school for malpractice, where plaintiff knew that defendant assumed to treat human ailments in accordance with the system taught in such school, the burden was upon her to show by competent evidence not only that his treatment was injurious or not effective, but that the requisite care and skill was not exercised by him in administering it, and such proof must be made by one engaged in treatment by similar methods to those employed by defendant.[2]

3. SAME—PLEADING—ALLEGATIONS IN DECLARATION SUFFICIENT.

> Allegations in the declaration that defendant knew or should have known that plaintiff's daughter when brought to him was afflicted with diphtheria, and that he failed or neglected to ascertain the nature of her ailment before treating her, were sufficient to charge malpractice.[3]

4. SAME—CHIROPRACTOR ASSUMED TO KNOW WHETHER AILMENT IS ONE HE PROFESSES TO TREAT.

> Where a chiropractor invites people to come to him for the relief of human ailments, but admits that there are certain ailments which he does not profess to treat, it must be assumed that he represents himself as possessing the necessary knowledge and skill to determine whether

[1]Physicians and Surgeons, 30 Cyc. p. 1575; [2]Id., 30 Cyc. pp. 1584, 1587; [3]Id., 30 Cyc. p. 1583.

On application of statutes regulating the practice of medicine to persons giving special kinds of treatment, see notes in 33 L. R. A. (N. S.) 179; 41 L. R. A. (N. S.) 559; L. R. A. 1917C, 822.

On degree of care and skill required of a chiropractor or osteopath, see note 31 A. L. R. 830.

the ailment of a person brought to him is such an one as his treatment would probably relieve.[4]

5. SAME—NEGLIGENCE—FAILURE TO ADVISE OF INFECTIOUS NATURE OF DISEASE.

If a chiropractor does not assume to treat infectious, communicable diseases, he may not be relieved of civil responsibility if he neglects to exercise reasonable care and skill to ascertain whether a person seeking his services is so afflicted, and, if so afflicted, it is his duty to so advise that the services of one familiar with such ailments may be secured.[5]

6. EVIDENCE—JUDICIAL NOTICE—DIPHTHERIA.

Courts will take judicial notice that diphtheria is an infectious, communicable disease.[6]

7. MALPRACTICE — NEGLIGENCE—DUTY TO ASCERTAIN IF AILMENT WAS INFECTIOUS DISEASE.

Where a child suffering from diphtheria was brought to a chiropractor for treatment, it being a disease he does not profess to treat, it was his duty to use reasonable care and skill to ascertain whether or not the child was so afflicted, and his neglect to do so would sustain a charge of malpractice.[7]

8. SAME—EVIDENCE—PROPER TO SHOW THAT DIPHTHERIA MAY BE SUCCESSFULLY TREATED.

In an action by a mother against a chiropractor for malpractice in treating her child, where said treatment was ineffective and the child died of diphtheria, as bearing on the result of defendant's neglect in failing to advise the mother of the nature of the ailment so that she might have secured proper treatment, she was entitled to show, if possible, that there is a customary and well-known form of treatment used successfully by those professing to cure ailments of this nature, and that proper treatment would probably have afforded relief and saved the life of the child.[8]

Error to superior court of Grand Rapids; Perkins (Willis B.), J., presiding.     Submitted April 15, 1925. (Docket No. 87.)     Decided October 1, 1925.

---

[4]Physicians and Surgeons, 30 Cyc. p. 1575; [5]Id., 30 Cyc. p. 1575; [6]Evidence, 23 C. J. § 1967; [7]Physicians and Surgeons, 30 Cyc. p. 1575; [8]Id., 30 Cyc. p. 1587.

Case by Theresa Janssen, administratrix of the estate of Laverne Janssen, deceased, against Henry J. Mulder for malpractice.  Judgment for defendant on a directed verdict.  Plaintiff brings error.  Reversed.

*Dunham, Cholette & Quail,* for appellant.
*Jewell, Raymond & Face,* for appellee.

SHARPE, J.  Plaintiff, as administratrix of the estate of her deceased child, Laverne, brings this action to recover the damages incident to her death, charging malpractice on the part of the defendant.

The defendant attended the Palmer School of Chiropractic at Davenport, Iowa, for 14 months, and received a graduation diploma.  After practicing for two years at Tipton, Iowa, he came to Grand Rapids. He did not comply with the law relative to registration of drugless healers in this State (2 Comp. Laws 1915, § 6726).  Prior to May, 1922, he had administered treatment to the plaintiff personally on many occasions.  Plaintiff's daughter, Laverne, aged about 7 years, became ill about the first of May.  Plaintiff testified that "she came down with an awful fever;" that she took her to defendant's office; that he "told me she had a fever and I should put her to bed;" that she put her in a bed at defendant's place, and later he took them home in his car.

"That night he wanted to know if he should come and treat the child any more, if he was to come to the house to treat her.  He did not say in particular what he would do or what treatment he would give her.  *  *  *  He came the next day.  We had some further talk.  He said he could cure—could treat the youngster—could help her.  *  *  *  About the fourth day after the child became sick I had further talk with him.  The trouble was in the throat.  I asked him if he was sure she didn't have diphtheria. He said, 'No,' that she didn't have it.  He said she had a good case of tonsilitis.  He thought he could

pull it through.    The Monday night that I called him over for the second time, I see that the child was breathing out of place.    It wasn't natural breathing. She hadn't breathed natural for several days.    That night I called him over and asked him if he didn't think there was something more seriously wrong with her than he had really thought.    He said, 'No, it is nothing but your nerves—you just imagine it,' he said—'the child is all right.'    At that time the child was breathing in gasps.    That condition got worse toward the last.    Her muscles all seemed to twist and jerk.    She had a temperature.    Her talking was difficult.    These conditions gradually grew worse."

The child died Tuesday morning at 5 o'clock.

"He had been there the night before—it seems to me around 7 or 8.    The last time he gave her a treatment he just adjusted the spine, as far as I know. I don't know, of course, what he calls it—it seems as though he stretched her neck.    *    *    *    She had quite a pain in her throat, didn't eat anything.    She was quiet a good share of the time.    At last it was hard for her to breathe.    I fanned her the whole Monday night before she died in order to keep her breathing."

On cross-examination she testified:

"After treating her he told me she had a good case of tonsilitis.    A few days later on he turned it into quinsy.    *    *    *    He said that in years to come, in a very short time, medical doctors would be entirely wiped off the map—they would all be chiropractors. I took it for granted that the chiropractor knew just as much as the medical doctor."

Plaintiff theretofore had lived at defendant's home for five weeks and "became pretty familiar with his line of work and heard discussions about it in the home."

The defendant, called for cross-examination under the statute, testified:

"I gave an adjustment of the spinal column, one specific vertebra, which I adjusted, and nothing more and nothing less.    By an adjustment I mean where

one vertebra is out of alignment compared with the one above and the one below, I adjusted to put it in juxtaposition with the one above and the one below.

"*Q.* And your theory is that by taking a pressure off of the nerve it will generate enough nerve supply to heal any injured or affected part of the body or overcome any disease?

"*A.* We don't claim any and every. We do not claim to cure. We adjust the cause, remove it, and the result follows.

"*Q.* Is it part of your theory that by removing a nerve pressure you can overcome any infectious communicable disease?

"*A.* Our contention is that when nerve pressure is relieved nature will take care of the rest.

"*Q.* Just read my question, Mr. Reporter. (Read.)

"*A.* We do not take care of those cases.

"*Q.* Now, doctor, in these nine years, how many cases of diphtheria have you treated?

"*A.* I have never taken care of any case of diphtheria.

"*Q.* Did you ever study diphtheria?

"*A.* I have as our study covers it, yes.

"*Q.* Did you ever study the pathological or clinical evidences of the disease?

"*A.* No; it is out of our line.

"*Q.* Neither do you study nor practice any bacteriological examinations?

"*A.* No, sir.

"*Q.* So that the cell of a diphtheria germ, so far as you are concerned, would look exactly like a typhoid fever, wouldn't it?

"*A.* Yes, sir.

"*Q.* So far as your knowledge is concerned, what are the symptoms of diphtheria?

"*A.* We do not study symptomology.

"*Q.* You do not know the symptoms of diphtheria?

"*A.* We confine ourselves to the spine.

"*Q.* You didn't know them on the 1st day of May, 1922?

"*A.* No.

"*Q.* Do you know the symptoms of tonsilitis?

"*A.* No.

"*Q.* Or of quinsy?

"*A.* No. I did not tell the mother that this little

girl had tonsilitis and that it probably would get worse and result in quinsy. I didn't call her trouble anything, I didn't name the disease.

"Q. What would you call it now? .

"A. I would call it an inco-ordination of the nerves. * * * When I first attended the child I did not take its temperature.

"Q. Do you know what normal temperature is?

"A. 96.5. The only way a temperature of 104 is worse to me is that it is the result of some cause. We do not pay much attention to temperatures only as we locate it on the spine. I never took the temperature of this child. There was some slight elevation when I first treated her, but that did not increase to any extent. She had sore throat.

"Q. Any difficulty in breathing at any time?

"A. No, sir. * * * We do not call that condition by any name. It was nothing but nerve pressure, or subloxation interfering with nerve pressure. When we are called to treat a person we examine the spine.

"Q. Diagnose the condition by the examination of the spine?

"A. We do not diagnose.

"Q. You examine the spine, don't you?

"A. I palpate the spine to find any abnormalities.

"Q. You examine it, don't you, with your eyes and with your fingers?

"A. Yes.

"Q. You form an opinion of what is wrong?

"A. Of where the trouble lies.

"Q. Then you proceed to treat it?

"A. Adjust it; yes, sir.

"Q. And that is just what you did in this case?

"A. Yes, sir.

"Q. Do you recognize such a thing as an infection?

"A. Of what?

"Q. Suppose you define 'infection?'

"A. Infection is where inflammation has taken place, for instance, if I cut my finger, infection may set in.

"Q. Just what do you mean by infection?

"A. If it commences to fester.

"Q. By fester, you mean what?

"A. I think that term is very plain.

"Q. By infection you mean that some foreign bod

enters through the skin and you say fester produces an irritation and a pus, doesn't it?

"*A.* Yes.

"*Q.* What is in the pus?

"*A.* I don't know.

"*Q.* The medical schools say it is full of germs, don't they?

"*A.* Possibly.

"*Q.* And that the germs are caused by reason of the foreign body or substance entering some break or abrasion in the skin?

"*A.* I don't recognize that.

"*Q.* You don't, but they do?

"*A.* Possibly.

"*Q.* When you have such a condition, can you cure that festering and that pus by rubbing the spine a little?

"*A.* We don't claim that we cure it.

"*Q.* If that pus is the result of something up here in the finger, it doesn't get there from your back bone getting out of shape, does it?

"*A.* A chiropractor has never claimed that.

"*Q.* If you were called, if this child had had a festered finger or an infected boil, or something, you would treat it, wouldn't you?

"*A.* I certainly would not.    It is out of our line. We confine ourselves wholly to the spine.

"*Q.* Why should you treat an infectious disease like diphtheria?

"*A.* I did not.

"*Q.* You maintain now that this was not diphtheria, don't you?

"*A.* As far as my knowledge of things is concerned, no.    I have never studied diphtheria.    We do not study it from a medical standpoint.    I never treated a case, to my knowledge.    I didn't know anything about it.    I didn't give any treatment for it."

After the child's death, an autopsy was performed by Dr. LeRoy, one of the coroners of the county.    He testified that she died of diphtheria.    Plaintiff's counsel then sought to show by him what "the regular and ordinary treatment administered for diphtheria in this and similar communities" was.    Defendant's

counsel objected.   After considerable argument, the court intimated that the objection would be sustained, and that plaintiff could not recover unless able to show that defendant had not exercised the care and skill in the treatment of the child prescribed by chiropractics.   No further proof was submitted.   A verdict for defendant was directed.   Plaintiff reviews the judgment entered thereon by writ of error.

1. Plaintiff's counsel insist that as defendant had no license to practice in this State, and yet held himself out to the public as competent to treat the bodily ailments of those patronizing him, he was practicing medicine within the meaning of our statutes relating thereto, and that his conduct in treating this child must be tested by the laws and rules applicable to licensed practitioners.

While a failure to comply with the registration statute might subject the defendant to a criminal prosecution, such failure, coupled with a showing of treatment given, is not in itself sufficient on which to base a charge of malpractice.   To maintain such an action, the plaintiff must show that the result complained of was due to negligence or unskilful treatment.   While not registered, the defendant was a graduate of a chiropractic school.   He but assumed to treat human ailments in accordance with the system taught in such school.   This fact was well known to plaintiff.   The burden was therefore cast upon her to show by competent evidence, not only that his treatment was injurious or not effective, but that the requisite care and skill was not exercised by him in administering it.   It necessarily follows that such proof must be made by one engaged in treatment by similar methods to those employed by defendant. With the merits of the several drugless systems of relieving human ailments the courts have no concern. It is sufficient to say that many of our citizens believe in their efficacy and secure the services of those

engaged in practicing them. The treatment given by any one of such practitioners would probably be deemed improper and unskilful when judged by physicians who are taught to treat such ailments by the use of drugs and medicines. The unfairness of permitting the test as to whether a particular treatment was proper or skilful to be determined by one who uses a different method, or follows the teaching of another system, must be manifest.

This is the first time a malpractice case involving this question has come before this court. *People* v. *Phippin*, 70 Mich. 6, and *Locke* v. *Ionia Circuit Judge*, 184 Mich. 535, were criminal prosecutions for failure to comply with the laws relative to registration.

In the following cases from other States, questions more or less similar to that here discussed were presented, and the conclusions reached were in harmony with the views we have expressed: *Atkinson* v. *School of Osteopathy*, 240 Mo. 338 (144 S. W. 816); *Wilkins* v. *Brock*, 81 Vt. 332 (70 Atl. 572); *Patten* v. *Wiggin*, 51 Me. 594 (81 Am. Dec. 593); *Spead* v. *Tomlinson*, 73 N. H. 46 (59 Atl. 376, 68 L. R. A. 432); *McGraw* v. *Kerr*, 23 Col. App. 163 (128 Pac. 870); *Martin* v. *Courtney*, 75 Minn. 255 (77 N. W. 813); *Wilcox* v. *Carroll*, 127 Wash. 1 (219 Pac. 34); *Jaeger* v. *Stratton*, 170 Wis. 579 (176 N. W. 61); *Berkholz* v. *Benepe*, 153 Minn. 335 (190 N. W. 800); *State* v. *Johnson*, 84 Kan. 411 (114 Pac. 390, 41 L. R. A. [N. S.] 539, and note thereto).

2. The declaration alleges that the defendant knew, or should have known, that the child when brought to him was afflicted with diphtheria, and we think may fairly be said to charge malpractice by failure or neglect to ascertain the nature of her ailment before treating her.

The defendant maintained an office to which people were invited to come for the relief of human ailments. He admits that there were certain of such ailments

which he did not profess to treat. It would seem to follow that he represented and held himself out to the public as possessing the necessary knowledge and skill to determine whether the ailment of the person brought to him was such an one as his treatment would probably relieve. If, as he testified, the class or practitioners to which he belongs does not assume to treat infectious communicable diseases, they may not be relieved of civil responsibility if they neglect to exercise reasonable care and skill to ascertain whether the person seeking their services is so afflicted.

When this child was brought to him, he admits that she had a fever, and was suffering with a sore throat. While the plaintiff knew the nature of the treatment administered by the defendant, she did not know whether such treatment would be efficacious to relieve the ailment with which the child was afflicted. It was the duty of the defendant to use reasonable care and skill to so ascertain. While he insists that he and others of his school of practice do not diagnose cases or treat diseases, and says that he knows nothing about germs, or the symptoms of tonsilitis, quinsy or diphtheria, he does assume to relieve pain and suffering. The words used by him in defining that which he does, such as "palpate" and "adjust," do not change the nature of the act he assumes to perform. The purpose of the mother in bringing her child to him was to secure relief to her from the fever and sore throat from which she was then suffering. When he undertook to administer treatment to her, he assumed the responsibility of determining whether the treatment he proposed to administer, and afterwards did administer, was such as might reasonably have been expected to afford relief. To so determine, it was incumbent on him to use reasonable care and skill to ascertain whether the ailments were of the

class to which his treatment applied. If not, it was his duty to so advise plaintiff, in order that she might secure the services of one familiar with such ailments. He admits that he made no effort to do so, although informed of facts as to her condition which plainly imposed the duty upon him. He admits that there are infectious and communicable human ailments, while denying that the word "diseases" is applicable to them, and says he does not treat them.

We may take judicial notice that diphtheria is an infectious, communicable disease. It is so recognized by the laws of this State. 1 Comp. Laws 1915, §§ 5011, 5084, 5091; Comp. Laws Supp. 1922, § 5145. That this child died of diphtheria there can be no doubt. Her condition when brought to the defendant, as well as the inquiry made by her mother, rendered it imperative for him to use reasonable care and skill to ascertain whether or not the child was so afflicted. His neglect in this respect, if established to the satisfaction of the jury, would sustain the charge of malpractice made by plaintiff.

As bearing on the result to the child of such neglect, we think the plaintiff was entitled to show, if possible, that there is a customary and well-known form of treatment used successfully by those of that particular profession who do profess to administer treatment to cure ailments of this nature, and that proper treatment by such a person would probably have afforded relief and saved the life of the child. *Kuechler* v. *Volgmann*, 31 A. L. R. 826 (180 Wis. 238, 192 N. W. 1015).

The judgment is reversed and set aside and a new trial granted, with costs to appellant.

MCDONALD, C. J., and CLARK, BIRD, MOORE, STEERE, and FELLOWS, JJ., concurred. WIEST, J., concurred in the result.