ATTORNEY GENERAL v BENO

Docket No. 61368. Submitted August 3, 1982, at Lansing.—Decided March 21, 1983. Leave to appeal applied for.

The Ingham Circuit Court, Robert Holmes Bell, J., relying on the former chiropractic act and acting in response to a complaint filed by the Attorney General, issued a preliminary injunction enjoining James J. Beno, D.C., a licensed chiropractor, from engaging in certain activities alleged to be outside the scope of the practice of chiropractic. The injunction remained in effect until the effective date of the Public Health Code. After the Public Health Code became effective, the court, on defendant's motion, dissolved the preliminary injunction and remanded the matter to the Department of Licensing and Regulation, Board of Chiropractic for an advisory opinion concerning whether the procedures conducted by defendant were violative of the new code provisions regarding chiropractic practice. Following hearings, the board entered an opinion, and the circuit court subsequently issued an opinion finding that the challenged procedures conducted by defendant were outside the scope of chiropractic practice as defined in the Public Health Code. An order was entered permanently enjoining defendant from engaging in the challenged practices. Defendant appeals. *Held:*

1. Neither the Public Health Code nor the Administrative Procedures Act authorizes a circuit court to remand a case to an agency for an advisory opinion. The action taken by the circuit court might more properly be characterized as a request for a declaratory ruling from the agency. The function of the circuit court should have been to review the board's rulings to determine whether they were contrary to law and supported by competent, material, and substantial evidence on the whole record.

2. The Public Health Code defines the practice of chiropractic as including diagnoses to determine the existence of spinal

REFERENCES FOR POINTS IN HEADNOTES
[1] 2 Am Jur 2d, Administrative Law §§ 527, 766.
[2-7] 61 Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 44, 132.
Scope of practice of chiropractic. 16 ALR4th 58.

subluxations or misalignments that produce nerve interference, indicating the necessity for chiropractic care. The x-raying of a patient's elbow cannot conceivably be for the purpose of locating spinal subluxations or misaligned vertebrae and therefore is not authorized by the statute.

3. The trial court correctly ruled that a chiropractor may not perform a general physical examination, may not collect urine and hair specimens for analysis and may not diagnose other than spinal subluxations or misalignments of the spine. Further, the court also correctly ruled that the defendant had no authority to execute a pre-employment record indicating that the patient had passed a complete physical examination.

4. The use of galvanic current, diathermy, and ultrasound are outside the practice of chiropractic and are prohibited.

5. A chiropractor may not sell, dispense, or prescribe vitamins or food supplements to a patient.

Affirmed as modified.

DANHOF, C.J., concurred in part and dissented in part. He would hold that chiropractors may dispense or prescribe vitamins and food supplements and that chiropractors may check a patient's pulse, blood pressure, or rate of respiration to determine whether to refer their patients elsewhere.

OPINION OF THE COURT

1. HEALTH — ADMINISTRATIVE LAW — COURTS — BOARD OF CHIRO-
    PRACTIC — REMAND.

    Neither the Public Health Code nor the Administrative Proce-
    dures Act authorizes a circuit court to remand a case to the
    Department of Licensing and Regulation, Board of Chiropractic
    for an advisory opinion; rather, the circuit court should review
    the board's rulings in the case to determine whether they were
    contrary to law and supported by competent, material, and
    substantial evidence on the whole record (MCL 24.201 *et seq.,*
    333.16401 *et seq.;* MSA 3.560[101] *et seq.,* 14.15[16401] *et seq.).*

2. HEALTH — PUBLIC HEALTH CODE — CHIROPRACTIC — X-RAYS.

    A chiropractor may x-ray a patient only for the purpose of
    locating spinal subluxations or misaligned vertebrae of the
    human spine; the x-raying of a patient's elbow is not authorized
    (MCL 333.16401[b][iii]; MSA 14.15[16401][b][iii]).

3. HEALTH — CHIROPRACTIC — PHYSICAL EXAMINATIONS.

    A chiropractor may not perform a general physical examination,
    may not collect urine and hair specimens for analysis, may not
    diagnose other than spinal subluxations or misalignments of

the spine, and has no authority to execute a pre-employment record indicating that a patient has passed a complete physical examination.

4. HEALTH — CHIROPRACTIC — PUBLIC HEALTH CODE — GALVANIC CURRENT — DIATHERMY — ULTRASOUND.

The use of galvanic current, diathermy, and ultrasound are outside the practice of chiropractic and the use of such procedures by chiropractors is prohibited by the Public Health Code (MCL 333.16401[b][iii]; MSA 14.15[16401][b][iii]).

5. HEALTH — CHIROPRACTIC — VITAMINS — FOOD SUPPLEMENTS.

A chiropractor may not sell, dispense, or prescribe vitamins or food supplements to a patient.

PARTIAL CONCURRENCE AND PARTIAL DISSENT BY DANHOF, C.J.

6. HEALTH — PUBLIC HEALTH CODE — CHIROPRACTIC — VITAMINS — FOOD SUPPLEMENTS — ADMINISTRATIVE PROCEDURES ACT.

*The Public Health Code specifically authorizes chiropractors to give nutritional advice and, in view of chiropractors' required expertise in the area, they should be allowed to dispense or prescribe vitamins and food supplements (MCL 333.16401[b][iii]; MSA 14.15[16401][b][iii]; 1979 AC, Supp 9, R 338.12005).*

7. HEALTH — CHIROPRACTIC — PULSE — BLOOD PRESSURE — RATE OF RESPIRATION.

*Chiropractors should be permitted to check a patient's pulse, blood pressure, or rate of respiration to determine whether to refer their patients elsewhere if for no other reason.*

*Frank J. Kelley*, Attorney General, *Louis J. Caruso*, Solicitor General, and *Max R. Hoffman, Jr.*, Assistant Attorney General, for plaintiff.

*Robert Dean*, for defendant.

Before: DANHOF, C.J., and J. H. GILLIS and M. R. KNOBLOCK,* JJ.

J. H. GILLIS, J. Defendant, James J. Beno, D.C., a licensed chiropractor, appeals as of right from a circuit court order enjoining him from engaging in

_____

* Circuit judge, sitting on the Court of Appeals by assignment.

certain activities alleged to be outside the scope of the practice of chiropractic.

In September, 1977, plaintiff filed a complaint seeking to enjoin defendant from engaging in certain practices. At the time the action was commenced, the practice of chiropractic was defined in the chiropractic act, former MCL 338.151 *et seq.;* MSA 14.591 *et seq.* The former act was subsequently repealed and replaced by the Michigan Public Health Code, 1978 PA 368, effective September 30, 1978, MCL 333.1101 *et seq.;* MSA 14.15 (1101) *et seq.* See, now, MCL 333.16401 *et seq.;* MSA 14.15(16401) *et seq.*

Following an initial hearing, the circuit court, on January 23, 1978, issued a preliminary injunction which remained in effect until the effective date of the Public Health Code. After the code became effective, the circuit court, on motion of defendant, dissolved the preliminary injunction and remanded the matter to the Department of Licensing and Regulation, Board of Chiropractic (hereinafter the board) for an "advisory opinion" concerning whether the procedures conducted by defendant were violative of the new code provisions regarding chiropractic practice.

Hearings were held before an administrative law examiner who issued proposed findings and conclusions of law. The board reviewed the matter on the record and, on January 27, 1981, entered an opinion which separately addressed each of the practices conducted by defendant.

On November 2, 1981, the circuit court issued an opinion finding that the challenged procedures conducted by defendant were outside the scope of chiropractic practice as defined in the Public Health Code. An order was entered November 19, 1981, permanently enjoining defendant from en-

gaging in the challenged practices. Defendant appeals.

Initially, we note that although the circuit court remanded the case to the agency for an "advisory opinion", nothing in either the Public Health Code or the Administrative Procedures Act (APA), MCL 24.201 *et seq.;* MSA 3.560(101) *et seq.,* authorizes such a procedure. In our opinion, the action taken by the trial court is more properly characterized as a request for a declaratory ruling from the agency, see Justice LEVIN'S opinion in *Greenfield Construction Co, Inc v State Highway Dep't,* 402 Mich 172, 221-222; 261 NW2d 718 (1978). Review of the board's decision should have been governed by MCL 24.263; MSA 3.560(163):

"On request of an interested person, an agency may issue a declaratory ruling as to the applicability to an actual state of facts of a statute administered by the agency or of a rule or order of the agency. An agency shall prescribe by rule the form for such a request and procedure for its submission, consideration and disposition. A declaratory ruling is binding on the agency and the person requesting it unless it is altered or set aside by any court. An agency may not retroactively change a declaratory ruling, but nothing in this subsection prevents an agency from prospectively changing a declaratory ruling. A declaratory ruling is subject to judicial review in the same manner as an agency final decision or order in a contested case."

The function of the circuit court should have been to review the board's rulings to determine whether they were contrary to law and supported by competent, material, and substantial evidence on the whole record. MCL 24.306; MSA 3.560(206); *Hutchinson v Dep't of Mental Health,* 108 Mich App 725, 729; 310 NW2d 856 (1981).

The "practice of chiropractic" is defined in MCL 333.16401; MSA 14.15(16401):

"(b) 'Practice of chiropractic' means that discipline within the healing arts which deals with the nervous system and its relationship to the spinal column and its interrelationship with other body systems. Practice of chiropractic includes:

"(i) Diagnosis, including spinal analysis, to determine the existence of spinal subluxations or misalignments that produce nerve interference, indicating the necessity for chiropractic care.

"(ii) The adjustment of spinal subluxations or misalignments and related bones and tissues for the establishment of neural integrity utilizing the inherent recuperative powers of the body for restoration and maintenance of health.

"(iii) The use of analytical instruments, nutritional advice, rehabilitative exercise and adjustment apparatus regulated by rules promulgated by the board pursuant to section 16423, and the use of x-ray machines in the examination of patients for the purpose of locating spinal subluxations or misaligned vertebrae of the human spine. The practice of chiropractic does not include the performance of incisive surgical procedures, the performance of an invasive procedure requiring instrumentation, or the dispensing or prescribing of drugs or medicine."

On appeal, we must determine whether the specific procedures conducted by defendant are outside the Public Health Code's provisions governing chiropractic care.

*Diagnosis, x-ray, and treatment of a patient's elbow*

Defendant testified at the administrative hearing that he took four x-rays of the patient's elbow in order to obtain diagnostic data and determine whether the problem was treatable through chiropractic procedures. The trial court enjoined defen-

dant from "[d]iagnosing or attempting to diagnose other than spinal subluxations or misalignments which produce nerve interference", and from "[t]reating or attempting to treat, or x-raying or attempting to x-ray an elbow".

Under § 16401(1)(b)(i), diagnosis is for the limited purpose of determining the existence of spinal subluxations or misalignments that produce nerve interference, indicating the necessity for chiropractic care. We recognize that nerve interference efferent the spinal column may produce symptoms in other parts of the body. Where a patient indicates pain in his elbow, the chiropractor may examine the elbow, but only for the purpose of determining whether the symptom is caused by nerve interference related to the spine. The chiropractor may remove the nerve interference through spinal adjustment, but may not directly treat the elbow.

Concerning the x-ray of a patient's elbow, § 16401(1)(b)(iii) specifically limits the use of x-ray machines in the examination of patients "for the purpose of locating spinal subluxations or misaligned vertebrae of the human spine". Since the x-ray of a patient's elbow cannot conceivably be for the purpose of *locating* spinal subluxations or misaligned vertebrae, it is not authorized by the statute.

*General physical examination*

Defendant conducted a complete physical examination of the patient, including a check of the patient's pulse, respiration, and blood pressure, and an examination of the heart, lungs, eyes, mouth, throat, and reflexes. In addition, defendant obtained a urine and hair sample for laboratory analysis. The trial court held that a complete physical examination "goes far, far beyond the

statutory guidelines for the practice of chiropractic".

Under the statute, diagnosis is for the limited purpose of determining the existence of spinal subluxations or misalignments which produce nerve interference. Defendant argues that differential diagnostic techniques are necessary to determine whether the patient's health problems are amenable to chiropractic treatment. This argument was considered and rejected by the Court in *Attorney General v Recorder's Court Judge,* 92 Mich App 42, 55-56; 285 NW2d 53 (1979), *lv den* 407 Mich 955 (1980), where it was stated:

"Appellant contends that he had a duty to ascertain whether a patient's ailments were of a type to which chiropractic might be applied, *Janssen v Mulder,* 232 Mich 183; 205 NW 159 (1925), and that the use of such diagnostic techniques was necessary for making such a determination. While analysis of human specimens may reveal the existence of organic problems untreatable by chiropractic, this is true for all diagnostic tests used by members of the medical profession. We do not believe the Legislature intended to authorize chiropractors to engage in general diagnostic techniques. Had such a result been intended, it could have been clearly stated, as was done with respect to the use of x-rays. Rather than authorizing general diagnostic techniques, the statute limited chiropractors to those methods which might reveal the existence of misaligned or displaced vertebrae."

Although that case was decided under the former statute, the interpretation quoted above remains fully applicable under the new code.

Defendant also contends that an evaluation of the patient's overall health is necessary to discover health risks which may affect the safety of a patient under chiropractic treatment. While we

agree that the information gained from general
diagnostic techniques and analysis of human speci-
mens may be important to the safe rendering of
chiropractic care, there is nothing in the licensing
statute requiring a chiropractor to be trained in
evaluating a patient's general physical condition
or assessing the health risks involved. For exam-
ple, a chiropractor is not trained in discerning
abnormalities in a patient's heart and lungs, or in
interpreting a urinalysis report. If a chiropractor
is concerned about the patient's general physical
condition, he should refer the patient to a physi-
cian trained in such matters.

It is true, as defendant notes, that many of the
differential diagnostic techniques are not, in and of
themselves, dangerous to the patient. However,
the potential harm occurs because the patient may
be led to believe that the chiropractor is capable of
detecting health ailments unrelated to the spine.
Thus, the patient may believe that no other physi-
cal problems exist and may fail to seek appropri-
ate medical care.

While chiropractic is a recognized discipline
within the healing arts, it remains, by statute, a
limited health profession. The trial court correctly
ruled that a chiropractor may not perform a gen-
eral physical examination, may not collect urine
and hair specimens for analysis, and may not
diagnose other than spinal subluxations or misa-
lignments of the spine. In addition, the court
correctly ruled that defendant had no authority to
execute a pre-employment record indicating that
the patient had passed a complete physical exami-
nation.

*Use of galvanic current, diathermy, and ultra-
sound*

Plaintiff next complains that the use of galvanic

current, diathermy, and ultrasound for diagnostic and treatment purposes are outside the scope of chiropractic. The board found that the statute authorizes their use for diagnosis, but not for treatment. The circuit court ruled that they constituted "invasive procedures requiring instrumentation" and that, therefore, such procedures are expressly prohibited by the act. MCL 333.16401(1)(b)(iii); MSA 14.15(16401)(1)(b)(iii).

We find it unnecessary to decide whether these practices are invasive. In our opinion, the activities are included within the practice of physical therapy. MCL       333.17801(1)(b);       MSA 14.15(17801)(1)(b). A person is not permitted to engage in the practice of physical therapy unless licensed as a physical therapist, or otherwise authorized by the act. Since chiropractors are not given an express authorization to perform these procedures, as are physical therapists, we find that such procedures are outside the practice of chiropractic and are prohibited.[1]

*Sale, dispensing or prescribing of vitamins or food supplements*

Defendant prescribed a vitamin compound known as "nuclix" to the patient to rebuild ligaments in his back. Expert testimony established that nuclix was considered a food for special dietary use and not a "drug" under the pharmacy and drug laws of the State of Michigan.[2] The circuit court held that a chiropractor may not sell, dispense, or prescribe vitamins to a patient. We agree.

Section 16401(1)(b)(iii) authorizes a chiropractor

[1] For a description of the educational and training prerequisites required of one who seeks licensure as a chiropractor see 1979 AC, Supp 9, R 338.12005, 12006.

[2] See MCL 333.17703; MSA 14.15(17703).

to give nutritional advice, but does not specifically address the use of vitamins and food supplements.

The Court in *Attorney General v Recorder's Court Judge, supra,* addressed the question of whether a chiropractor could dispense various non-prescription medicines for colds, headaches, pain, and nasal congestion, and topical medicine for rash and a scrape on the arm. The Court stated as follows:

"In *Attorney General v Raguckas,* 84 Mich App 618, 624, 625; 270 NW2d 665 (1978), this Court ruled that chiropractors were not authorized to dispense prescription drugs or perform acupuncture.

* * *

"While the Court in *Raguckas* was concerned with prescription durgs, we conclude that the rationale of that case is likewise applicable to non-prescription medicines.

"In *State v Wilson,* 11 Wash App 916; 528 P2d 279 (1974), the Washington Supreme Court ruled that chiropractors may not give or prescribe minerals, vitamins or food supplements. The Court noted that while these items are available without prescription in retail stores they may, nevertheless, be dangerous when improperly used.

"We agree with this analysis and conclude that the Michigan Legislature did not intend that chiropractors use any medicine given internally or externally for the treatment of disease or other human ailment." 92 Mich App 54-55.

*Recorder's Court Judge* involved non-prescription medicines rather than vitamins or food supplements. Nonetheless, the same concerns about the danger of improper use are present in the instant case. Chiropractors are not required to be disciplined in the use of vitamins and food supplements. While these materials are not "drugs" and

are not regulated by the Public Health Code, we take judicial notice of the potential danger involved when they are misused. This concern was voiced in *Norville v Mississippi State Medical Ass'n,* 364 So 2d 1084, 1089 (Miss, 1978):

"Norville has argued strenuously that since none of the vitamins involved require medical prescription and may be purchased by any layman over the counter in most stores, use of such vitamins should not be denominated 'practice of medicine.' We are fully cognizant that any layman can obtain such vitamins and that any retailer can sell such vitamins. Purchase of or sale of vitamins is not however the vice which is condemned here. Rather the vice condemned and that which constitutes the unlicensed practice of medicine is (1) prescription of vitamins, (2) to cure, (3) an ailment or disease, (4) for compensation.

"The chiropractor on the present facts does not simply sell vitamins to a customer who asks for them as does a retailer. Rather, he represents to a patient who has come to him that such vitamins will cure a disease or ailment. Further, unlike the relative or friend who recommends that someone take vitamins for nutrition or to prevent colds, and neither expects nor receives any compensation for such 'advice,' the chiropractor in a professional capacity advises the patient to take the vitamins for the ailment or disease, charges compensation for such advice, and may cause the patient to think his ailment or disease will thereby be cured. This is the vice condemned and the danger of such is amply demonstrated by the record."

The chiropractor, as a licensed health care provider, stands in a unique relationship to his patient. In view of the dangers expressed in *Norville,* it is our opinion that, had the Legislature intended to authorize chiropractors to prescribe, sell, or dispense vitamins and food supplements, it would have specifically so provided.

Affirmed as modified.

M. R. Knoblock, J., concurred.

Danhof, C.J. *(dissenting in part and concurring in part).* Although I agree with the result reached by the majority in most respects, I find that I cannot agree with their treatment of the issue concerning the ability of chiropractors to recommend to their patients the use of food supplements and vitamins.

The items in question are not regulated by the controlled substances section of the Public Health Code. MCL 333.7101 *et seq.;* MSA 14.15(7101) *et seq.* On the contrary, they are readily accessible in most health food stores and in many other unregulated retail establishments. The majority, relying on *Attorney General v Recorder's Court Judge,* 92 Mich App 42; 285 NW2d 53 (1979), concludes that chiropractors are precluded from prescribing or dispensing these items because the statute does not specifically authorize them to do so.

In my opinion, the majority's reliance on *Attorney General v Recorder's Court Judge, supra,* is misplaced. That opinion involved the chiropractic act, former MCL 338.151 *et seq.;* MSA 14.591 *et seq.* The former act was replaced by the occupations section of the Public Health Code, MCL 333.16101 *et seq.;* MSA 14.15(16101) *et seq.,* which, unlike the former act, specifically authorizes chiropractors to give nutritional advice. MCL 333.16401(b)(iii); MSA 14.15(16401)(b)(iii). Furthermore, contrary to the majority's assertion, chiropractors are now required to be trained and tested in subjects which are designed to provide them with expertise in this area *e.g.,* anatomy, physiology, chemistry, pathology, microbiology, public

health, rehabilitative procedures and nutrition). 1979 AC, Supp 9, R 338.12005.

The majority's reliance on *Norville v Mississippi State Medical Ass'n,* 364 So 2d 1084 (Miss, 1978), is also improper. The Mississippi statute which was involved in that case specifically prohibited chiropractors from using drugs in treatment. Miss Code Ann § 73-6-1. Furthermore, the statute broadly defined the term drugs to include "all medicines for internal or external use for man or beast". Miss Code Ann § 1-3-7. The Court ruled that the foregoing evinced a strong legislative intent to preclude chiropractors from prescribing any substance for internal use.

Our statute contains no similar prohibition. On the contrary, as noted above, the Legislature has specifically authorized chiropractors to give nutritional advice. Furthermore, in view of the widespread availability of these items, and the fact that chiropractors are now required to be disciplined in this area, I am of the opinion that chiropractors may dispense or prescribe vitamins and food supplements.

I also disagree, in part, with the majority's treatment of the issue concerning whether chiropractors may check a patient's pulse, blood pressure, or rate of respiration. The majority notes that if chiropractors are concerned about their patient's physical condition, they should refer them to physicians. Even if the statute requires a finding that chiropractors are precluded from checking their patients' pulse, blood pressure, or respiration for purposes of determining whether it is safe to engage in manipulative exercises, chiropractors should at a minimum be permitted to utilize those procedures to determine whether to refer their patients elsewhere.