BRAFORD v O'CONNOR CHIROPRACTIC CLINIC

Docket No. 215848. Submitted November 14, 2000, at Detroit. Decided December 12, 2000, at 9:00 A.M. Leave to appeal sought.

Thomas Braford, as personal representative of the estate of Teresa Braford, brought an action in the Wayne Circuit Court against O'Connor Chiropractic Clinic and John R. O'Connor, D.C., alleging that Teresa Braford suffered a fatal heart attack as a result of the defendants' malpractice in failing to recognize that she had a heart condition, and in failing to refer her to a medical practitioner qualified to treat her heart ailment, when she consulted with, and was treated by, the defendants for pain in her chest and arms. The defendants moved for summary disposition, arguing that the plaintiff had failed to state a claim on which relief can be granted. The court, William J. Giovan, J., denied the motion. The defendants appealed by leave granted.

The Court of Appeals *held*:

The scope of chiropractic practice is limited by statute to the diagnosis and treatment of spinal subluxations or misalignments that produce nerve interference. The statute does not permit chiropractors to perform differential diagnosis, i.e., examination of areas of the body other than the spine in order to determine whether spinal subluxations or misalignments are producing nerve interference.

In this case, the defendants did not have a duty to recognize and diagnose Teresa Braford's cardiac symptoms and a duty to refer her to a qualified medical practitioner for treatment of her heart problem. Such diagnosis and referral would have required the defendants to undertake a medical analysis—specifically a differential diagnosis—and make medical determinations that the statute does not permit.

Reversed.

HEALTH — CHIROPRACTORS — STANDARD OF CARE.

The scope of chiropractic practice, as delimited by statute, does not include differential diagnosis, i.e., examination of areas of the body other than the spine in order to determine whether spinal subluxations or misalignments are producing nerve interference; a chiropractor does not have a duty to diagnose a nonspinal ailment and

refer the patient to another medical practitioner qualified to treat the ailment where such diagnosis and referral require the chiropractor to undertake a differential diagnosis (MCL 333.16401; MSA 14.15[16401]).

*Materna, Custer & Associates* (by *Michael T. Materna*) and *Donald M. Fulkerson,* Of Counsel, for the plaintiff.

*David D. Patton & Associates, P.C.* (by *David D. Patton* and *Ellen Bartman Jannette*), for the defendants.

Before: COLLINS, P.J., and JANSEN and WHITBECK, JJ.

PER CURIAM. Defendants O'Connor Chiropractic Clinic and John R. O'Connor, D.C., appeal by leave granted the trial court's order denying their motion for summary disposition pursuant to MCR 2.116(C)(8). Plaintiff Thomas Braford, personal representative of the estate of Teresa Braford, brought a wrongful death action against defendants, alleging that O'Connor committed medical malpractice when he failed to detect symptoms of Teresa Braford's cardiac problems. We reverse.

### I. BASIC FACTS AND PROCEDURAL HISTORY

Teresa Braford first sought chiropractic care from O'Connor in April 1994. Her chief complaints were recurring headaches as well as numbness in her arms and hands. After listening to Braford describe her problems and reviewing x-rays, O'Connor concluded that she was suffering pain due to an injury she sustained in 1975. He then treated her accordingly throughout April and May 1994.

In July 1994, however, Braford visited the emergency room at Botsford General Hospital in Farmington Hills because she was experiencing severe pain. The record does not reveal if the emergency room staff diagnosed her problem. However, she was released with instructions to consult her chiropractor and a neurologist and to return to the hospital if her symptoms worsened. Later that same month, Braford visited O'Connor and told him that she had pain in her left thoracic (chest) area and both arms. She said that she had used ice to quell the pain. O'Connor concluded that her condition related to her prior cervical spine injury and noted that as soon as he adjusted her back, her pain subsided. O'Connor last treated Braford in early September 1994, at which time she voluntarily released herself from his care.

On February 3, 1995, Braford complained to her husband that she was in pain. At her request, he left work early to go home to be with her. After arriving at home, he went to the grocery store for a short time. When he returned, he found his wife slumped on the couch. She was rushed to the hospital where she was pronounced dead. The cause of death was later determined to be a myocardial infarction.

Plaintiff filed this wrongful death action alleging medical malpractice in June 1997. After discovery, defendants moved for summary disposition, arguing that they did not have a duty to diagnose Braford's nonchiropractic ailments and refer her to a medical doctor. The trial court denied the motion[1] and granted

---

[1] When the trial court rendered its opinion denying defendants' motion from the bench, it first discussed *Attorney General v Beno*, 422 Mich 293; 373 NW2d 544 (1985). The trial court then moved to an extensive discussion of this Court's recent unpublished opinion in *Cobb v Beatty Chiro-*

plaintiff permission to amend the complaint.[2] Defendants subsequently moved for summary disposition again on the same legal ground and also argued that a genuine issue of material fact did not exist with regard to whether O'Connor suspected that Braford suffered from cardiac symptoms. The trial court again denied defendants' motion. It appears that the trial court found that a genuine issue of material fact existed with regard to whether O'Connor was aware of Braford's cardiac symptoms and, reiterating its

---

*practic Clinic (On Rehearing)*, unpublished opinion of the Court of Appeals, issued February 6, 1998 (Docket No. 187421). In that case, this Court found that a chiropractor did not have a duty to (1) "suspect" that a patient was suffering from a serious medical condition or (2) to refer the patient to a qualified medical practitioner. The trial court found a "problem" with the *Cobb* decision and stated that "if Cobb stands for the proposition that a chiropractor doesn't even have to worry about suspecting something far short of diagnosing, well I wouldn't follow that opinion. That doesn't promote the public safety." The trial court went on to say that *Cobb* was "not only bad law, it's bad policy." The trial court, although apparently meaning to draw some distinctions between "suspecting" a cardiovascular issue and "referring" the patient for medical treatment, declined to follow this Court's decision in *Cobb*. Instead, the trial court, while apparently believing that a plaintiff need not even allege a duty to refer to make out a cause of action, stated that when a chiropractor makes a chiropractic diagnosis, "he'd better be right" and found that the complaint stated a cause of action.

[2] The parties appear to disagree about the substance, and the extent, of the amended complaint. Defendants note that paragraph 18 of the amended complaint averred that O'Connor "never referred Plaintiff to a medical doctor, an internist, or a cardiologist or advised her these symptoms may not have been related to a subluxation or spinal misalignment." Plaintiff notes that paragraph 21(t) of the amended complaint asserted that defendants provided "unnecessary and contraindicated chiropractic treatment for a condition that was not a chiropractic problem but was in fact of a cardiovascular nature" and that paragraph 21(e) of the amended complaint alleged a breach of duty for the failure to refer Braford to a "licensed physician." While we grant that there is a considerable variation from the language of the complaint to the language of the amended complaint, we think it fair to conclude that, despite this variation, both complaints present the issues whether O'Connor had a duty to recognize and diagnose Braford's symptoms as a medical, nonchiropractic problem and whether he had to refer her to a medical practitioner.

prior ruling,[3] that defendants did have a duty to diagnose Braford's nonchiropractic ailments and refer her to a medical practitioner.[4] We granted leave to appeal and stayed the matter pending resolution of the appeal.

## II. THE ISSUE ON APPEAL

This case presents an issue of first impression in Michigan. Even though the Michigan Supreme Court and this Court have considered the scope of chiropractic practice in a variety of factual contexts, our research has not revealed a published decision by the appellate courts of this state setting out the parameters of a chiropractor's duty to refer a patient to another medical profession. Simply put, we must decide not only whether O'Connor had a duty to recognize and diagnose Braford's symptoms as a medical, nonchirorpractic problem, but whether he also had to refer her to a medical practitioner.

---

[3] The trial court stated, "There are two parts to your Motion and I have already ruled on one of them."

[4] The trial court again rendered its opinion denying defendants' motion from the bench and was again less than clear in its basis for its second ruling. The trial court again appeared to take issue with this Court's decision in *Cobb*, *supra*. When plaintiff's attorney argued that there was evidence that Braford "presented with [a] cardiovascular complaint," the trial court commented that "the two lines converge into the next one." We are at a loss to understand the meaning of this comment within the context of this case. However, there is no question that the trial court denied defendants' motion for summary disposition and we think it fair to conclude that it did so basically on the same grounds as it denied defendants' original motion for summary disposition. We also grant that, as we have noted above, those grounds were less than crystal clear on the record. It is clear, however, that the trial court disagreed with this Court's decision in *Cobb*, *supra*. In the trial court's defense, according to MCR 7.215(C)(1), because our decision in *Cobb* was an unpublished opinion, it was not binding precedent under the rule of stare decisis.

### III. STANDARD OF REVIEW

We review de novo whether a trial court properly denied a motion for summary disposition.[5]

### IV. LEGAL STANDARD FOR SUMMARY DISPOSITION

A trial court must grant a motion for summary disposition when "[t]he opposing party has failed to state a claim on which relief can be granted."[6] A motion for summary disposition pursuant to MCR 2.116(C)(8) tests whether a claim is sufficient as a matter of law.[7] In other words, the court deciding the motion "determines whether the plaintiff's pleadings allege a prima facie case."[8] Pursuant to MCR 2.116(G)(5), a court may only consider the pleadings, accepting all well pleaded facts as true.[9] In its analysis, the Court may make reasonable inferences from the allegations in the pleadings.[10]

### V. THE PRIMA FACIE CASE AND THE STANDARD OF CARE

As with any negligence action, to sustain a claim of medical malpractice, a plaintiff must demonstrate four elements: (1) the standard of care that applies, (2) that the defendant breached that standard of care, (3) that the plaintiff sustained an injury, and (4) that

---

[5] *Van v Zahorik*, 460 Mich 320, 326; 597 NW2d 15 (1999).

[6] MCR 2.116(C)(8).

[7] *Stott v Wayne Co*, 224 Mich App 422, 426; 569 NW2d 633 (1997), aff'd on other grounds 459 Mich 999 (1999).

[8] *Garvelink v Detroit News*, 206 Mich App 604, 608; 522 NW2d 883 (1994).

[9] *New Hampshire Ins Group v Labombard*, 155 Mich App 369, 372; 399 NW2d 527 (1986).

[10] *Harrison v Director of Dep't of Corrections*, 194 Mich App 446, 449-450; 487 NW2d 799 (1992).

the defendant's breach of the standard of care proximately caused the alleged injury.[11] Defendants in this case challenge the first two elements, focusing on the standard of care. Plaintiff's amended complaint attempted to define this standard of care by listing twenty-six alleged breaches relating to a chiropractor's duty to recognize the symptoms of a myocardial infarction and to recommend that a patient experiencing those symptoms seek medical help with an appropriate medical professional.

The standard of care is not the same in every case, but varies according to the level of technology and general expertise in the medical community.[12] Ordinarily, the standard of care for general practitioners derives from practice standards in the local community, while the standard of care for specialists derives from the standards practiced across the nation.[13] Also relevant to the standard of care is the legal scope of a practitioner's ability to care for patients at all. MCL 333.16401; MSA 14.15(16401) defines this scope of care for chiropractors by providing in relevant part:

> (b) "Practice of chiropractic" means that discipline within the healing arts which deals with the nervous system and its relationship to the spinal column and its interrelationship with other body systems. Practice of chiropractic includes:
>
> (i) Diagnosis, including spinal analysis, to determine the existence of spinal subluxations or misalignments that produce nerve interference, indicating the necessity for chiropractic care.

---

[11] *Locke v Pachtman*, 446 Mich 216, 222; 521 NW2d 786 (1994).

[12] *Cudnik v William Beaumont Hosp*, 207 Mich App 378, 383; 525 NW2d 891 (1994).

[13] *Id.*

(ii) The adjustment of spinal subluxations or misalignments and related bones and tissues for the establishment of neural integrity utilizing the inherent recuperative powers of the body for restoration and maintenance of health.

(iii) The use of analytical instruments, nutritional advice, rehabilitative exercise and adjustment apparatus regulated by rules promulgated by the board pursuant to section 16423 and the use of x-ray machines in the examination of patients for the purpose of locating spinal subluxations or misaligned vertebrae of the human spine. The practice of chiropractic does not include the performance of incisive surgical procedures, the performance of an invasive procedure requiring instrumentation, or the dispensing or prescription of drugs or medicine.

While relevant, this statute does not specifically define the standard of care for chiropractors.[14]

### VI. EARLY CASE LAW

Case law serves as a useful starting point in our effort to define the scope of a chiropractor's standard of care in order to determine whether O'Connor violated that standard of care with Braford. As early as 1925, which was before the Legislature enacted MCL 333.16401; MSA 14.15(16401), the Michigan Supreme Court held in *Janssen v Mulder*[15] that when a chiropractor treats a patient, the chiropractor has a duty "to use reasonable care and skill" to determine if the patient's ailments can be treated with chiropractic therapy at all. If the patient's problems cannot be treated with chiropractic techniques, the chiropractor's duty is to advise the patient that chiropractic treatment was not available so that the patient could

---

[14] *Wengel v Herfert*, 189 Mich App 427, 430; 473 NW2d 741 (1991).

[15] *Janssen v Mulder*, 232 Mich 183, 192-193; 205 NW 159 (1925).

consult a medical practitioner with appropriate expertise.[16] The Court's decision in *Janssen* stopped short of saying that a chiropractor had a duty to recognize the nature of the problem that was outside the scope of ordinary chiropractic practice and to refer the patient to an appropriate practitioner in another field of medicine. Rather, the implication in *Janssen* was that a chiropractor would satisfy the standard of care by recognizing that the patient's problem was not a chiropractic problem and then informing the patient of that narrow fact so that the patient could choose what step to take next.

Fifty years later, in *Tschirhart v Pethtel*,[17] this Court held that a chiropractor could be held liable for malpractice for failing to diagnose a condition that could not be treated with chiropractic care and to refer the patient to a medical doctor. The *Tschirhart* Court concluded that there was sufficient evidence to sustain the jury's verdict in favor of the plaintiff because the evidence suggested that the defendant knew that a herniated disk might be causing the plaintiff's symptoms, the defendant knew this was a condition that chiropractic techniques could not treat, and the defendant still failed to refer the plaintiff to a medical doctor.[18] Although defining the scope of chiropractic care beyond the standard set in *Janssen*, the facts of *Tschirhart* justified liability because the defendant actually knew that the problem should be treated by a physician and withheld that information to his patient's detriment.

---

[16]  *Id.*

[17]  *Tschirhart v Pethtel*, 61 Mich App 581, 584-585; 233 NW2d 93 (1975).

[18]  *Id.*

This Court in *Attorney General v Recorder's Court Judge,*[19] a case decided under the statute[20] that preceded MCL 333.16401; MSA 14.15(16401), reached a decision that gave a more substantive, albeit narrow, definition to the standard of care for chiropractors. This Court determined that the Legislature intended to prohibit chiropractors from engaging in general diagnostic techniques such as throat cultures and urine samples.[21] Rather, chiropractors could only use methods that would reveal the existence of misaligned or displaced vertebrae.[22] While the *Attorney General* opinion focused on the tests the chiropractor administered, the implication is that the Court concurrently limited the duty to diagnose various ailments by reducing chiropractors' ability to detect those ailments using various tests. Essentially, the Court began to distinguish between medicine and chiropractic care in a more detailed manner.

This Court revisited the question of a chiropractor's duty of care in *Cotter v Blue Cross & Blue Shield of Michigan,*[23] where it again endorsed a narrow interpretation of the statute[24] defining a chiropractor's ability to treat patients. The Court held that general diagnostic x-rays, examinations, and other services unrelated to diagnosing spinal ailments were not within the lawful scope of chiropractic practice.[25]

---

[19] *Attorney General v Recorder's Court Judge,* 92 Mich App 42, 55-56; 285 NW2d 53 (1979).

[20] MCL 338.156; MSA 14.596, repealed by 1978 PA 368, § 25101.

[21] *Attorney General, supra.*

[22] *Id.*

[23] *Cotter v Blue Cross & Blue Shield of Michigan,* 94 Mich App 129, 136; 288 NW2d 594 (1979).

[24] MCL 338.156; MSA 14.596, repealed by 1978 PA 368, § 25101.

[25] *Cotter, supra.*

VII. *BENO* AND ITS PROGENY

More recently, the Michigan Supreme Court examined the scope of chiropractic practice in *Attorney General v Beno*.[26] The dividing line between medical and chiropractic care was at the heart of the legal issue in *Beno,* in which the Court had to determine whether a chiropractor was unlawfully practicing medicine by performing, among other practices, general physical examinations and related diagnostic tests.[27] The defendant in *Beno* argued that the section of the Public Health Code dealing with chiropractors[28] permitted him to examine areas of the body other than the spine in order to determine whether spinal subluxations or misalignments were producing nerve interference—a process defined as "differential diagnosis."[29] Once again, the Court narrowly construed the scope of chiropractic practice by examining the language in the statute and observing that the Legislature used precise terms to define chiropractic care while using expansive language to delimit medical practice.[30] For the first time, however, the Court also added a public policy element to its approach to defining the scope of chiropractic practice, writing:

> Where there are hazy lines between the jurisdiction of health-care professions, we think the public health and safety is best protected by more strictly construing the jurisdiction of the more specialized and limited health profession in favor of the more comprehensively trained and licensed profession. It would seem more in keeping with

---

[26] *Attorney General v Beno*, 422 Mich 293; 373 NW2d 544 (1985).

[27] *Id.* at 297-300.

[28] MCL 333.16401; MSA 14.15(16401).

[29] *Beno, supra* at 306, 311-312.

[30] *Id.* at 311-312.

public protection to have the broader discipline making diagnostic observations about those things within the specialties of the narrower discipline, rather than vice versa.[31]

Ultimately, the Court concluded that the ability to perform a differential diagnosis would be beneficial to some patients; however, the Public Health Code did not permit chiropractors to perform a differential diagnosis because "to allow this kind of diagnosis would require the chiropractor to recognize other maladies that are possible in many other parts of the anatomy and, in such case, lead the patient to believe that a definitive diagnosis relating to those other maladies that may be causing symptoms has been received."[32]

This Court adhered to the reasoning in *Beno* in *Wengel v Herfert*[33] when it addressed the plaintiff's argument that the defendant chiropractor negligently failed to examine him to rule out a variety of health conditions.[34] The *Wengel* Court held that the chiropractor could not be held liable for failing to do something that the chiropractic statute prohibited.[35] Nothing in *Wengel* addressed the existence or nonexistence of an affirmative duty on the part of chiropractors to warn their patients of the limits of the practice of chiropractic. Further, in *Hofmann v Auto Club Ins Ass'n*,[36] this Court noted that a chiropractor's authority to analyze and monitor the body's

---

[31]   *Id.* at 312 (citations omitted).

[32]   *Id.* at 313.

[33]   *Wengel v Herfert*, 189 Mich App 427, 429-432; 473 NW2d 741 (1991).

[34]   *Id.* at 430.

[35]   *Id.* at 431-432.

[36]   *Hofmann v Auto Club Ins Ass'n*, 211 Mich App 55, 87; 535 NW2d 529 (1995).

physiology is necessarily limited to the spinal area; to hold otherwise would allow the defendant to perform a differential diagnosis, which *Beno* barred.

### VIII. APPLYING *BENO* AND *WENGEL*

In our view, the Michigan Supreme Court's reasoning in *Beno* applies here. The gravamen of plaintiff's complaint is that defendants should be held liable for O'Connor's failure to recognize and diagnose Braford's nonspinal ailments and refer her to another health-care professional. *Beno* dealt with the scope of chiropractic practice in a different factual context and did not involve a malpractice claim. Instead, it dealt with the proper, i.e., legal, scope of chiropractic care. However, in many ways, the scope of chiropractic care and the standard of care are two sides of the same coin; the former identifies what a chiropractor may or may not do and the latter establishes what the chiropractor must do. The *Beno* Court's reasoning on the scope of chiropractic care is sound and guides our inquiry in the present case, even with respect to the standard of care.

Plaintiff specifically argues that one part of O'Connor's negligence stems from his failure to realize that Braford's symptoms were not related to a subluxation or misalignment of her spine. In other words, he claims O'Connor had an obligation to perform a differential diagnosis to find the reason why Braford was in pain so that he could then conclude whether the problem could be treated with chiropractic techniques. Because *Beno* rejected the notion that chiropractors should be able to examine and diagnose nonspinal ailments during the course of chiropractic treatment, this Court in *Wengel, supra,* concluded

that they cannot be held accountable for failing to perform this service. We reaffirm this conclusion.

O'Connor's ability to refer Braford to a physician for treatment of her cardiac symptoms directly depended on his ability to determine that she had those symptoms and that they signaled an illness that could not be treated with chiropractic care. This is not merely a question whether O'Connor, as an individual, had the skills to recognize symptoms of an impending heart attack. As a matter of law, O'Connor could not perform the diagnostic tests and other examinations necessary to reach this conclusion. Thus, it would be illogical to conclude that he not only had to come to the conclusion on the basis of the symptoms he observed in Braford, but that he had to know enough about the underlying medical problem to refer her to an appropriate practitioner in another field of medicine.[37] Therefore, we conclude that O'Connor did not have a duty to refer Braford for treatment of her underlying heart problem. Further, we conclude that, because he could not perform the diagnostic tests and other examinations necessary to diagnose an impending heart attack, he did not have a

---

[37] Plaintiff directs us to foreign authority in support of his argument that O'Connor owed Teresa Braford a duty to recognize the nature of her nonchiropractic ailments, cease treatment, and refer her to a doctor accordingly. See *Roberson v Counselman*, 235 Kan 1006, 1010; 686 P2d 149 (1984); *Mostrom v Pettibon*, 25 Wash App 158, 161; 607 P2d 864 (1980); *Ison v McFall*, 55 Tenn App 326, 359-360; 400 SW2d 243 (1964); *Rosenberg v Cahill*, 99 NJ 318; 492 A2d 371 (1985); see also anno: *Liability of chiropractors and other drugless practitioners for medical malpractice*, 77 ALR4th 273; anno: *Chiropractors liability for failure to refer patient to medical practitioner*, 58 ALR3d 590; anno: *Scope of practice of chiropractic*, 16 ALR4th 58. We have reviewed these authorities and find them unpersuasive in light of the Michigan Supreme Court's narrow interpretation of the scope of chiropractic practice in *Beno*.

duty to recognize and diagnose Braford's cardiac symptoms.

### IX. CONCLUSION

Presuming all factual allegations pleaded by plaintiff to be true, plaintiff failed to state a claim on which relief can be granted. We conclude that (1) O'Connor did not have a duty to refer Braford to a qualified medical practitioner for treatment of her underlying heart problem and (2) O'Connor did not have a duty to recognize and diagnose Braford's cardiac symptoms. Such conduct would require a chiropractor to undertake a medical analysis—specifically a differential diagnosis—and make medical determinations that the licensing statute does not permit. Therefore, the trial court erred in denying defendants' motion for summary disposition.

Reversed.