ATTORNEY GENERAL v BENO

Docket No. 71558. Argued October 3, 1984 (Calendar No. 8).—Decided
August 27, 1985.

The Attorney General brought an action in the Ingham Circuit
Court, seeking to enjoin James J. Beno, D.C., a licensed chiro-
practor, from the unlicensed practice of medicine. The court,
James T. Kallman, J., issued a preliminary injunction. After
passage of the Public Health Code in 1978, the court, Robert
Holmes Bell, J., granted the defendant's motion for reconsidera-
tion, dissolved the preliminary injunction, and remanded the
case to the Department of Licensing and Regulation, Board of
Chiropractic, for an advisory opinion concerning whether the
defendant's procedures were violative of the provisions of the
new code regarding chiropractic practice. After review by the
board, the court found that the procedures were outside the
scope of chiropractic practice and permanently enjoined the
defendant from engaging in the procedures. The Court of
Appeals, J. H. GILLIS and KNOBLOCK, JJ. (DANHOF, C.J., dissent-
ing in part and concurring in part), affirmed (Docket No.
61368). The defendant appeals.

In an opinion by Justice BRICKLEY, joined by Justices LEVIN,
RYAN, CAVANAGH, and BOYLE, the Supreme Court held:

A chiropractor may not be enjoined from engaging in the
unlicensed practice of medicine on the ground that the prac-
tices complained of are outside the scope of chiropractic prac-
tice unless the practices are found to be within the practice of
medicine.

1. The Public Health Code defines chiropractic and requires a
person who practices it to be licensed. Chiropractic is a disci-
pline that deals with the nervous system and its interrelation-
ship with other body systems. It includes diagnosis, including
spinal analysis, to determine the existence of spinal subluxa-
tions or misalignments that produce nerve interference and
thus indicating the need for chiropractic care. Chiropractic

REFERENCES FOR POINTS IN HEADNOTES
[1, 2, 4-6] Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 5,
121 et seq.
Scope of practice of chiropractic. 16 ALR4th 58.

treatment includes adjustment of spinal subluxations or misalignments and related bones and tissues to promote restoration and maintenance of health by utilizing the inherent recuperative powers of the body. The practice includes the use of analytical instruments, nutritional advice, rehabilitative exercise, and adjustment apparatus which are regulated by rules of the Board of Chiropractic. It also includes the use of x-rays in the examination of patients for the purpose of locating spinal subluxations or misaligned vertebrae of the spine. The practice does not include the performance of incisive surgical procedures or invasive procedures requiring instrumentation, or the dispensing or prescription of drugs or medicine.

2. The x-ray, diagnosis, and treatment of an elbow are all outside the statutory definition of chiropractic practice. The Public Health Code provides for such practices only for the purpose of locating spinal subluxations or misalignments. The Legislature did not intend that chiropractors be authorized to perform differential diagnosis to rule out the existence of localized non-spinal ailments in areas such as an elbow. While x-rays may be used to locate subluxations or misalignments in the spine, they may not be used to rule out local problems. Where there are hazy lines between the jurisdiction of health-care professions, the public health and safety is best protected by more strictly construing the jurisdiction of more specialized and limited fields, such as chiropractic, in favor of those requiring more comprehensive training and licensing.

3. A comprehensive physical examination, including the analysis of blood, hair, and urine samples, physical observations of the throat, mouth, and eyes, the taking of pulse and blood pressures, and the examination of the lungs and abdomen, are outside the scope of chiropractic practice. The plain words of the code do not evince any legislative intent to license chiropractors to engage in such practices, the legislative history indicating that the drafters consciously rejected them. The purpose of obtaining bodily specimens and performing physical examinations is to diagnose and discover maladies and diseases which are not strictly limited to spinal subluxations or misalignments. The Legislature rejected the inclusion of differential diagnoses and physical examinations within the scope of chiropractic, and permitted chiropractors only to undertake diagnosis to determine the need for chiropractic care.

4. The practice of chiropractic does not include the performance of incisive surgical procedures or the performance of invasive procedures requiring instrumentation. The practice does include the use of analytical instruments, nutritional advice, rehabilitative exercise, and adjustment apparatus for

examining patients to locate spinal subluxations and misalignments, provided that the recognized standards and rules approved by the Board of Chiropractic are met. Use of galvanic current, ultrasound, or diathermy for treatment or therapeutic purposes is neither expressly nor impliedly authorized by the chiropractic act, and the record supports the conclusion that their use is outside the scope of chiropractic practice. The record is unclear, however, whether the use of the galvanic stimulator as an analytical or diagnostic tool, as opposed to treatment, is permissible. Thus remand is required to determine whether use of the galvanic stimulator results in an invasive procedure and, if not, whether its use is permitted as an analytical instrument for diagnostic purposes. On remand, determination should also be made whether use of ultrasound, galvanic current, or diathermy constitutes the practice of medicine without a license or some other violation of the Health Code.

5. The diagnosis of a patient's general health by means of a complete physical examination for the purposes of completing an employee health record is outside the scope of chiropractic practice. There is nothing in the chiropractic act which would indicate an intent to include within the scope of chiropractic practice the making of determinations regarding the condition of a patient's general anatomy and certifying or representing the state of the patient's general health.

6. The practice of dispensing vitamin or food supplements to patients by chiropractors is within the provisions of the act authorizing a chiropractor to give nutritional advice as part of a program to correct a subluxation or misalignment of the spine. However, chiropractors are precluded from using drugs or medicines in treatment.

Chief Justice WILLIAMS, concurring, stated that the practice of chiropractic is not limited solely to those practices enumerated in the chiropractic statute, but includes all other practices not declared to be within the exclusive jurisdiction of a different healing art or a practice totally prohibited to anyone.

Reversed in part and remanded.

Justice RILEY took no part in the decision of this case.

124 Mich App 342; 335 NW2d 31 (1983) reversed in part and remanded.

### OPINION OF THE COURT

1. HEALTH — PUBLIC HEALTH CODE — CHIROPRACTORS — INJUNCTIONS — UNLICENSED PRACTICE OF MEDICINE.

A chiropractor may not be enjoined from engaging in the unli-

censed practice of medicine on the ground that the practices complained of are outside the scope of chiropractic practice unless the practices are found to be within the practice of medicine (MCL 333.16291[1]; MSA 14.15[16291][1]).

2. HEALTH — PUBLIC HEALTH CODE — CHIROPRACTORS — SCOPE OF CHIROPRACTIC PRACTICE.

Chiropractic practice, as provided by the Public Health Code, includes the use of x-rays, analytical instruments, nutritional advice, rehabilitative exercise, and adjustment apparatus, as regulated by the Board of Chiropractic, for the purpose of locating spinal subluxations or misaligned vertebrae of the spine; such procedures may not be used to diagnose or rule out the existence of localized non-spinal ailments such as those pertaining to an elbow (MCL 333.16401[1]; MSA 14.15[16401][1]).

3. HEALTH — PUBLIC HEALTH CODE — CHIROPRACTORS — SCOPE OF CHIROPRACTIC PRACTICE.

The practice of chiropractic does not include the performance of incisive surgical procedures or invasive procedures requiring instrumentation, or the dispensing or prescribing of drugs or medicine (MCL 333.16401[1]; MSA 14.15[16401][1]).

4. HEALTH — PUBLIC HEALTH CODE — CHIROPRACTORS — PHYSICAL EXAMINATIONS — EMPLOYMENT HEALTH RECORDS — SCOPE OF CHIROPRACTIC PRACTICE.

The performing of a comprehensive physical examination, including the analysis of blood, hair, and urine samples, physical observations of the throat, mouth, and eyes, the taking of pulse and blood pressures, and the examination of the lungs and abdomen are outside the scope of chiropractic practice, including performing such an examination for the purpose of completing an employee health record (MCL 333.16401[1]; MSA 14.15[16401][1]).

5. HEALTH — PUBLIC HEALTH CODE — CHIROPRACTORS — VITAMINS — DRUGS AND MEDICINES — SCOPE OF CHIROPRACTIC PRACTICE.

A chiropractor may recommend or dispense vitamin or food supplements to patients under the provisions of the Public Health Code authorizing chiropractors to give nutritional advice as part of a program to correct a subluxation or misalignment of the spine; however, chiropractors are precluded from using drugs or medicines in the treatment of patients (MCL 333.16401[1]; MSA 14.15[16401][1]).

CONCURRING OPINION BY WILLIAMS, C.J.

6. HEALTH — PUBLIC HEALTH CODE — CHIROPRACTORS — SCOPE OF
   CHIROPRACTIC PRACTICE.
   *The practice of chiropractic is not limited solely to those practices
   enumerated in the chiropractic statute, but includes all other
   practices not declared to be within the exclusive jurisdiction of
   a different healing art or a practice totally prohibited to anyone
   (MCL 333.16401[1]; MSA 14.15[16401][1]).*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Mary K. Hicks,* Assistant Attorney General, for the Attorney General.

*Robert Dean* for the defendant.

Amici Curiae:

*Michael C. Levine* for Michigan State Chiropractic Association.

*Kirkpatrick W. Dilling* and *Robert E. Armstrong* for The National Health Federation.

BRICKLEY, J. This case requires interpretation of the "practice of chiropractic" under the licensing provision of the Public Health Code as it relates to the use of x-ray in other than the spinal area, the giving of a general physical examination including the analysis of hair and urine samples, the execution of an employee health record, the use of galvanic current, ultrasound, and diathermy, and the dispensing of vitamins to patients.

We hold that the dispensing of vitamins is within the practice of chiropractic, that the record is not sufficiently developed to decide the applicability of the statute as to the use of galvanic current for diagnostic purposes, but concur with the Court of Appeals that the remaining enumerated practices fall outside of the chiropractic statute. We find, however, that the issuance of an

injunction against these practices, merely because they are not included within chiropractic, is in error, and we remand for an opportunity to establish that they constitute the unlicensed practice of medicine, or some other "violation" of article 15 of the Public Health Code so as to justify an injunction. MCL 333.16291(1); MSA 14.15(16291)(1).

I

BACKGROUND

This case arises as a result of visitations by an investigator employed by the Department of Licensing and Regulation, at the office of Dr. James Beno, a licensed chiropractor. In his first visit to the office in March of 1977, the investigator complained of low back pain and a sore elbow. He completed a personal data card and history sheet. The appellant then took a series of four x-rays of the lower back and four x-rays of the right elbow and asked the investigator-patient to return at a later date.

A second visit occurred a week later, at which time appellant performed a physical examination, which included a taking of the patient's blood pressure, a reading of his pulse, and an examination of his lungs, eyes, ears, nose, throat, mouth and heart. Dr. Beno further performed a series of neurological tests by tapping with a rubber hammer and palpating various portions of the investigator's anatomy. A urine specimen was obtained. Next, the appellant photographed the investigator's spinal area with a polaroid camera in a process called contour analysis. The patient was then placed on a table where Dr. Beno, using a Rich-MAR galvanic stimulator, sought trigger points or hypersensitive neurological irritants in

his back. Following the proceedings, he was asked to return with his spouse to discuss treatment.

With a female investigator posing as his wife, the investigator returned for a third office call five days later. Dr. Beno described the patient's spine as being slightly twisted and one hip as being higher than the other. This was explained as a problem involving an L-5-S-1 subluxation, and the doctor presented the patient with a proposed treatment plan. The treatment plan was said to have an eighty-nine percent probability of complete recovery based on similar conditions in other patients. Therapy would include adjustments to free pinched nerves, ultrasound to reduce irritation, and, to accelerate healing, deep massage and diathermy would be used. Also included in the therapy would be intersegmental traction to tighten ligaments and stabilize joints, galvanic currents to release trigger points, a second set of x-rays and complete examination, as well as oral intake of Nuclix, a dietary supplement containing vitamins and minerals, in order to rebuild back ligaments. Compensation was discussed.

During this third visit, Dr. Beno executed a form employee health record indicating that the investigator was approved for employment. He put check marks under the category "normal" for numerous aspects of the investigator's health, including heart, chest-lungs, abdomen, eyes, head, and skin. Dr. Beno signed the form in a box marked "examining physician," but with the letters "D.C." following his signature. In the course of his testimony Dr. Beno revealed that while he did not do so on this occasion, he also frequently used hair sample analysis in his patient work-up.

In September of 1977, appellee filed a complaint in circuit court seeking to enjoin defendant from engaging in certain practices mentioned above. At

the time the action was commenced, the practice of chiropractic was defined in the chiropractic act, MCL 338.151 *et seq.;* MSA 14.591 *et seq.* The act was subsequently repealed and replaced by the Public Health Code, 1978 PA 368, effective September 30, 1978, MCL 333.1101 *et seq.;* MSA 14.15(1101) *et seq.* See MCL 333.16401 *et seq.;* MSA 14.15(16401) *et seq.*

Following an initial hearing, the circuit court, on January 23, 1978, issued a preliminary injunction which remained in effect until the effective date of the Public Health Code, September 30, 1978.[1] After the code became effective, the circuit court, on motion of appellant, dissolved the preliminary injunction and remanded the matter to the Department of Licensing and Regulation, Board of Chiropractic, for an "advisory opinion" concerning whether the procedures conducted by Dr. Beno were violative of the new code provisions regarding chiropractic practice.[2]

Hearings were then held before an administrative law examiner who issued findings of fact and conclusions of law. The board reviewed the matter on the record and on January 27, 1981, entered an opinion which separately addressed each of the practices conducted by appellant.

In May of 1981, the circuit court entered an

---

[1] The validity of this first injunction is not at issue.

[2] We note that the Attorney General objected to this remand and made an emergency application for leave to appeal, a motion to stay, and a motion for immediate consideration to the Court of Appeals. The Court of Appeals denied the application for leave to appeal and the motion to stay "for failure to persuade the Court of the need for immediate appellate review." Since that point, the Attorney General has not again questioned the circuit court's authority to order a remand to the Board of Chiropractic. As a result, this issue is not now before us, and we express no opinion as to its validity. We also do not pass upon the Court of Appeals analysis of the remand. *Attorney General v Beno,* 124 Mich App 342, 346; 335 NW2d 31 (1983).

order that further proceedings in the case were to be treated as an appeal from an administrative agency.[3] On November 2, 1981, the circuit court issued an opinion finding that the challenged procedures conducted by appellant were outside the scope of chiropractic practice as defined in the Public Health Code. On November 19, 1981, the court permanently enjoined defendant from engaging in those practices.[4]

The Court of Appeals affirmed the trial court's order permanently enjoining defendant from engaging in the practices determined to be outside the scope of chiropractic practice. *Attorney General v Beno,* 124 Mich App 342; 335 NW2d 31 (1983).

We granted defendant's application for leave to appeal on May 17, 1984. 419 Mich 877.

## II

### FINDINGS OF LOWER TRIBUNALS

Defendant's practices and procedures that were

---

[3] As noted in footnote 2, neither party has challenged the validity of this or any other procedural aspect of the case and we express no opinion thereon.

[4] The permanent injunction provided as follows:

"It is hereby ordered that Defendant, his agents and employees, unless such persons are licensed to practice medicine, shall be and hereby are permanently enjoined from:

"A. Diagnosing or attempting to diagnose other than spinal subluxations or misalignments which produce nerve interference;

"B. Performing a physical examination which includes eyes, ears, nose, throat, lungs or abdomen, or employing blood pressure, pulse, urine sample, tongue depressor or stethoscope in the course of said examination;

"C. Executing a pre-employment physical record without identifying himself as a chiropractor or D.C., or certifying or attempting to certify the general condition of anything other than the spinal column;

"D. Treating or attempting to treat, or x-raying or attempting to x-ray an elbow;

"E. Obtaining, attempting to obtain, or analyzing urine samples or conducting hair analysis;

"F. Selling, dispensing or prescribing vitamins to a patient;

"G. Utilizing galvanic current, ultrasound or diathermy for the diagnosis or treatment of a patient."

ultimately enjoined were treated in the following manner in the course of the development of the record before us.

The hearing officer, Board of Chiropractic, trial court, and the Court of Appeals found that the taking of x-rays of the elbow exceeded the scope of the practice of chiropractic. The hearing officer, trial court, and the Court of Appeals found that the giving of a general physical examination and the use of urine and hair samples also exceeded the scope of chiropractic, but the board found their use to be within the practice of chiropractic. The hearing officer and the board were in agreement that the execution of an employment approval physical form was within the purview of chiropractic under the act, but the trial court and the Court of Appeals found it to be outside the act.

All four bodies found the use of ultrasound, diathermy, and galvanic procedures to be outside the practice of chiropractic, with the exception that the board held that the galvanic current procedure could be used for diagnostic purposes.

Finally on the question of the prescription and sale of vitamins, the hearing officer and the board found it within the scope of chiropractic, while the courts disagreed.

## III

### Analysis

The appellant points out that the approach of the lower tribunals was to examine each of the practices and procedures complained of by testing them against the statutory definition of the practice of chiropractic, and to the extent they were found not to be defined therein they were consid-

ered to be unlawful. He argues persuasively, we find, that the purpose of the licensing statute is not to prohibit the doing of those acts that are excluded from the definition of chiropractic, but to make it unlawful to do without a license those things that are within the definition. In other words, appellant's activities are not automatically enjoinable merely because they are not within the scope of chiropractic practice. Rather, an injunction is only proper, under article 15 of the Health Code, upon a finding that the practices complained of constitute a "violation" of a statute or rule promulgated under article 15. MCL 333.16291(1); MSA 14.15(16291)(1). An obvious example of enjoinable activities are those that constitute the practice of medicine where the actor is without a medical license to do so. MCL 333.17001(c); MSA 14.15(17001)(c).

The Attorney General does not dispute appellant's contention in this regard, but rather argues that all of these activities that were enjoined were outside of chiropractic and that despite no such finding below we should find as a matter of law that they amounted to the practice of medicine without a license.

The practice of medicine is defined as

the diagnosis, treatment, prevention, cure, or relieving of a human disease, ailment, defect, complaint, or other physical or mental condition, by attendance, advice, device, diagnostic test, or other means, or offering, undertaking, attempting to do, or holding oneself out as able to do, any of these acts. [1978 PA 368, § 17001(1)(c); MCL 333.17001(1)(c); MSA 14.15(17001)(1)(c).]

We find appellant's argument to be obviously valid. The chiropractic statute does not prohibit the exercise of any non-chiropractic health-care

activity. It only defines chiropractic and requires a person who practices it to be licensed. MCL 333.16411; MSA 14.15(16411).

It may well be that some or all of defendant's activities that are found to exceed the more limited practice of chiropractic amount to the practice of medicine under the broad statutory definition of that discipline. In that case, assuming that defendant is not also licensed to practice medicine, the activities in question would be enjoinable. MCL 333.16291(1); MSA 14.15(16291)(1). However, minus findings to that effect and absent opportunities for the defendant to dispute this assumption, we are reluctant to make that finding on this record.[5]

Our analysis, as a result, will focus on the question whether the practices in question are within the practice of chiropractic. To the extent they are not, we will remand for an opportunity for the plaintiff to establish that the defendant has engaged in the practice of medicine without a license.

We begin then with an analysis of the definition of the practice of chiropractic and measure against it the complained of practices.

The practice of chiropractic is delineated in MCL 333.16401(1); MSA 14.15(16401)(1), which provides, in pertinent part:

> (b) "Practice of chiropractic" means that discipline within the healing arts which deals with the nervous system and its relationship to the spinal column and its interrelationship with other body systems. Practice of chiropractic includes:
> (i) Diagnosis, including spinal analysis, to determine the existence of spinal subluxations or misalignments that produce nerve interference, indicating the necessity for chiropractic care.

---

[5] There was no testimony by a medical doctor or by a representative of the medical board.

(ii) The adjustment of spinal subluxations or misalignments and related bones and tissues for the establishment of neural integrity utilizing the inherent recuperative powers of the body for restoration and maintenance of health.

(iii) The use of analytical instruments, nutritional advice, rehabilitative exercise and adjustment apparatus regulated by rules promulgated by the board pursuant to section 16423, and the use of x-ray machines in the examination of patients for the purpose of locating spinal subluxations or misaligned vertebrae of the human spine. The practice of chiropractic does not include the performance of incisive surgical procedures, the performance of an invasive procedure requiring instrumentation, or the dispensing or prescribing of drugs or medicine.

## A. Diagnostic X-Ray and Treatment of Elbow

Because the investigator-patient complained of a sore back and right elbow, Dr. Beno took four x-rays of the right elbow and, before the administrative law examiner, testified that had the investigator returned, he would have done a "further examination" of the elbow including an "orthopedic evaluation." The inquiry on the further examination would have been into whether the elbow pain was caused by a local disorder (*i.e.*, whether the pain originated in the elbow) or by a spinal subluxation or misalignment.

The trial court enjoined defendant from "diagnosing or attempting to diagnose other than spinal subluxations or misalignments which produce nerve interference" and from "treating or attempting to treat, or x-raying or attempting to x-ray an elbow."

Defendant asserts that chiropractors are authorized to diagnose an elbow ailment to determine if its cause is local (*i.e.*, originates in the elbow area)

or results from nerve interference created by spinal subluxations or misalignments. At the hearing, defendant testified that pain in an extremity, such as an elbow, can be caused by spinal subluxations or misalignments. He further stated that it is medically impossible to determine whether the cause is local or spinal without an examination and diagnosis ruling out a local cause for the ailment. (This process of elimination is sometimes referred to as differential diagnosis, as will be later discussed.)

Section 16401(1)(b)(i), cited by defendant as the statutory basis of his authority to x-ray and examine an elbow, provides in part: "[p]ractice of chiropractic includes: (i) Diagnosis, including spinal analysis, to determine the existence of spinal subluxations or misalignments that produce nerve interference, indicating the necessity for chiropractic care." Defendant claims that the words "that produce nerve interference" mean that chiropractors may examine ailments in areas other than the spine to determine whether spinal subluxations or misalignments are producing nerve interference and thus causing the non-spinal ailment.

The appellee, Attorney General, cites the same provision as defendant, but argues that "the treatment of or attempt to treat an extremity falls outside the statutory authority of a chiropractor and constitutes the practice of medicine." Appellee also cites § 16401(1)(b)(iii) which provides in part:

(b) Practice of chiropractic includes:

* * *

(iii) . . . *the use of x-ray machines in the examination of patients for the purpose of locating spinal subluxations or misaligned vertebrae of the human spine.* [Emphasis added.]

The Attorney General contends that if the Legis-

lature had intended other uses of x-rays by chiro-practors, it could have authorized such use for other purposes, such as ruling out a localized problem as producing pain. But, he argues that under the statute chiropractors may only use x-rays for one purpose—to locate spinal subluxations or misaligned vertebrae of the human spine. Thus, the Attorney General concludes, "[i]f a chiroprac-tor wants to rule out a localized problem as a possible producer of pain, he should refer the patient to a physician whose extended training qualifies him to diagnose and treat areas of the body other than the spine."

The Attorney General also cites *Cotter v Blue Cross,* 94 Mich App 129, 133; 288 NW2d 594 (1979), *lv den* 408 Mich 947 (1980). In *Cotter,* Blue Cross and Blue Shield of Michigan sent notice to the plaintiff subscribers that any "[d]iagnostic x-rays of other than the spine ordered and/or per-formed by a chiropractor" would be excluded from coverage. At that time chiropractors were autho-rized to "use x-ray and such analytical instru-ments as are approved by [the board] in the exami-nation of patients solely for the purpose of locating misaligned or displaced vertebrae of the human spine and for the procedures preparatory thereto." (1933 PA 145 as amended, MCL 338.156; MSA 14.596.) The Court of Appeals in that case, without analysis, upheld the trial court's grant of sum-mary judgment in Blue Cross's favor with the effect that it affirmed the trial court ruling that x-rays of other than the spine were outside the scope of chiropractic as then defined.

The hearing officer in this case stated that

[t]o the extent that a [chiropractor] upon examina-tion of the spinal column can identify a problem in another extremity arising from and as a result of

a condition in the spinal column then it would be permissible for the chiropractor to provide treatment to address the problem in the *spinal column* that may interreact with other portions of the body system. However, that does not imply that one can diagnose problems in other extremities including diagnostic x-rays of those extremities purportedly on the basis that those extremities are somehow interrelated with the total nervous system and the spinal column.

\* \* \*

[U]nless the diagnosis and treatment of the spinal column would address the symptoms in the other extremities, a chiropractic practitioner would be precluded from diagnosing and treating the symptom in the other extremity. [Emphasis in original.]

The hearing officer held that "x-ray of an elbow is outside the scope of chiropractic," stating, "[t]he statute is clear and it stretches logic as to how the x-ray of a right elbow is in any way encompassed by the [language of the statute]."

The Board of Chiropractic held:[6]

A chiropractor may use symptoms affecting the right elbow of the patient as a part of an examination to determine whether the affliction may be caused by spinal subluxations or misalignments that produce nerve interference. It is quite possible that a patient presenting symptoms involving the right elbow may have nerve interference which is causative of, or contributory to, the elbow problem. While it is true that the chiropractor may only treat by directly affecting the spine, diagnosis may involve other parts of the body since the nerve network, efferent from the spinal column, affects other parts of the body. The chiro-

---

[6] The Board of Chiropractic consists of seven members, five of whom are chiropractors and two of whom are public members. MCL 333.16421; MSA 14.15(16421).

practor is not diagnosing the right elbow problem to determine whether there is something that needs to be treated by him in the elbow, but only for the purpose of determining nerve interference related to the spine. The chiropractor may not directly treat the elbow, nor would he want to. The chiropractor would remove nerve interference through spinal adjustment to effectuate improvement in the condition of the elbow which was related to the nerve interference.

If the diagnosis indicates no nerve interference as the cause of the elbow problem, the chiropractor would refer the patient to another health care provider who would diagnose the specific cause of the problem.

They conclude that x-ray of the elbow is not within the scope of the practice of chiropractic.

The board implicitly agreed with appellant's contention that by medical necessity the chiropractor must diagnose or examine the elbow to determine whether the elbow problem is caused by nerve interference related to the spine. Yet, according to the board, the chiropractor still may only treat the spine, not the elbow. The board's conclusion is based on its premise that "the nerve network, efferent from the spinal column, affects other parts of the body." The board seemed to say that since by statutory definition "the practice of Chiropractic [is that discipline] which deals with the nervous system and its relationship to the spinal column *and* its interrelationship with other body systems," chiropractors are authorized to diagnose "other body systems" to determine whether problems therein are caused by the "nervous system" which is centered in the spinal column.

The trial court held:

Both the treatment and the X-rays of an elbow

are also outside the scope of chiropractic as statutorily defined. It stretches credibility to conclude that the elbow is so related to the spine that spinal subluxations or misalignments may produce nerve interference in the elbow. The logic of this position would extend chiropractic through the entire body and even the brain! Certainly, that was not the intention of the legislature. Likewise, under    MCL    333.16401(1)(b)(iii)    [MSA 14.15(16401)(1)(b)(iii)] the use of X-ray machines in the examination of patients is for the purpose of locating spinal subluxations or misaligned vertebrae. The elbow contains neither misaligned vertebrae nor spinal subluxations.

The trial court thus rejected the defendant's contention that nerve problems in the elbow can be based in spinal subluxations or misaligned vertebrae.

The Court of Appeals held:

Under § 16401(1)(b)(i), diagnosis is for the limited purpose of determining the existence of spinal subluxations or misalignments that produce nerve interference, indicating the necessity for chiropractic care. We recognize that nerve interference efferent the spinal column may produce symptoms in other parts of the body. Where a patient indicates pain in his elbow, the chiropractor may examine the elbow, but only for the purpose of determining whether the symptom is caused by nerve interference related to the spine. The chiropractor may remove the nerve interference through spinal adjustment, but may not directly treat the elbow.

Concerning the x-ray of a patient's elbow, § 16401(1)(b)(iii) specifically limits the use of x-ray machines in the examination of patients "for the purpose of locating spinal subluxations or misaligned vertebrae of the human spine." Since the x-ray of a patient's elbow cannot conceivably be for the purpose of *locating* spinal subluxations or

misaligned vertebrae, it is not authorized by the statute. [Emphasis in original. 124 Mich App 348.]

Unlike the trial court, the Court of Appeals accepted the appellant's view when it acknowledged that "nerve interference efferent the spinal column may produce symptoms in other parts of the body." While the Court held that a chiropractor may "examine" the elbow, "but only for the purpose of determining whether the symptom is caused by nerve interference related to the spine," it upheld the trial court's injunction.

The defendant now asserts that since he can perform "diagnosis . . . to determin[e] the existence of spinal subluxations or misalignments that *produce* nerve interference . . . ," he must be able to examine and diagnose the parts of the body where nerve interference may be manifesting itself, especially since the practice of chiropractic concerns "the nervous system and its relationship . . . with other body systems."

Before answering that question, we express several observations that guide our interpretation of the statute. First, an examination of MCL 333.16401; MSA 14.15(16401) in its entirety manifests to us an intent to carve out of the healing arts genre a limited profession known as chiropractic. While "practice of chiropractic . . . deals with the nervous system" in relation to the rest of the body, the diagnosis and treatment provisions of the act focus specifically on spinal subluxations or misalignments. MCL 333.16401(1)(b)(i), (ii); MSA 14.15(16401)(1)(b)(i), (ii). The act does not contain the general, all encompassing terms found in the section of the code pertaining to the practice of medicine.

Second, MCL 333.16401(2); MSA 14.15(16401)(2) provides that interpretation of the chiropractic

section is guided by general definitions and principles of construction in article 1 of the Public Health Code. One of the paramount rules of construction provides that "[t]his code shall be liberally construed for the protection of the health, safety, and welfare of the people of this state." MCL 333.1111(2); MSA 14.15(1111)(2).

Where there are hazy lines between the jurisdiction of health-care professions, we think the public health and safety is best protected by more strictly construing the jurisdiction of the more specialized and limited health profession in favor of the more comprehensively trained and licensed profession. It would seem to be more in keeping with public protection to have the broader discipline making diagnostic observations about those things within the specialties of the narrower discipline, rather than vice versa. See Anno: *Scope of practice of chiropractic,* 16 ALR4th 58.

The defendant here wants to be able to examine the elbow to determine if there is nerve interference. While it is not directly established in the record, we are indirectly led to believe from the testimony that the existence of a spinal subluxation or misalignment cannot be observed by examination of areas away from the spine that may be experiencing the pain of nerve interference. Rather the existence of subluxations or misalignments of the spine can only be observed where they exist. This reading of the record is fortified by the defendant's own brief where it is stated: "[a]nd it is absolutely medically necessary to at times x-ray other parts of the body, other than the spine, if the chiropractor is to accurately diagnose which of the subluxations shown on x-ray is the cause of the patient's complaint. That may only be done by the elimination of localized problems, such as fracture or bone abnormality." Only by the process of

elimination of other possible maladies (differential diagnosis) can the chiropractor then advise the patient that the pain in the elbow was caused by the spinal difficulty, which itself can only be directly observed in the spinal area.

It could be helpful for the patient to know the consequences of his subluxation or misalignment, and it may influence the desirability of chiropractic treatment. Presumably, it would also help the chiropractor explain why spinal treatment will not in given situations cure painful symptoms. Nevertheless, to allow this kind of diagnosis would require the chiropractor to recognize other maladies that are possible in many other parts of the anatomy and, in such case, lead the patient to believe that a definitive diagnosis relating to those other maladies that may be causing symptoms has been received.[7] We do not believe the Legislature intended to authorize such diagnostic techniques.

[7] An examination of the defendant's testimony is instructive on how not only the patient can be misled as to the role of chiropractic in diagnosing other parts of the body.

"In many instances, we have to look at the body as a whole in order to analyze any given condition to treat locally, to treat very specifically in one area and treat a subluxation, to me, is not getting to the underlying cause of the patient's problem and to me, we must look wholistically, at the entire body. We must look at the structure. We must analyze the feet, they are the original foundation of the spine, neurologically, things can happen to the feet which can produce neurological reflex of pain like a reverberation of pain all the way up to the lower back area and to me, if I'm not allowed to work on an area such as the feet, the neurological reflex arc area can never be corrected and thereby maybe never stabilizing not stabilize out the low back situation. Maybe this sounds—I know I know what I'm talking about here and maybe you don't understand what I'm saying, it's extremely important to analyze any situation and if there's a knee problem, I like to know why the knee problem would be there. If it's there because of arthritis or spurs or cartilage problems, orthopedic tests, x-ray examination could be a displacement due to the various injuries that should be corrected along with the low back in order to just get the entire situation stabilized on a more permanent basis. We can talk about relief or we can talk stabilization. If a patient just wants relief, you can go ahead and replace the vertebrae. If it's subluxated, test and see if there's nerve interference, but what about stabilization? I don't understand many times why you have to, you know, once it's stabilized and corrected and these are the goals

In early drafts of the Public Health Code, such differential diagnosis was included as part of the practice of chiropractic. Substitute House Bill 6306, § 16401(1)(b), 1976, provided in part:

> "Practice of chiropractic" means that discipline within the healing arts which deals with the nervous system and its relationship to the spinal column and its interrelationship with other body systems. *It utilizes differential diagnosis* and spinal analysis to determine the existence of spinal subluxations or misalignments that produce nerve interference, *or the necessity for referral to other health care professionals,* and the adjustment of spinal subluxations or misalignments and related bones and tissues for the establishment of neural integrity utilizing the inherent recuperative powers of the body for the restoration and maintenance of health. It includes the use of analytical instruments, nutritional advice, rehabilitative exercise and adjustment apparatus regulated by rules promulgated by the board of chiropractic pursuant to section 16423 and the use of x-ray machines in the examination of patients for the purpose of locating spinal subluxations or misaligned vertebrae of the human spine. *As used in this subdivision, "differential diagnosis" means the determination of the necessity of chiropractic care or the referral to other health care professionals by the use of spinal analysis, physical examination, or interpretation of referred diagnostic procedures.* [Emphasis added.]

and plans I work with my patients is to try to stabilize their condition, looking at the body as a whole, analyzing from tip to toe, as to why that problem could be there; analyzing posture, analyzing muscles and analyzing other structures, that's the only way it should be done, to be done correctly and I think that's a new approach coming into being and within the next twenty-five (25) to fifty (50) years, you're going to see this approach take hold and you're going to see the doctors . . . of chiropractic that use this method . . . are going to be doctors that patients will go to, to get their ailments taken care of and stabilized, rather than running here or there to try and get relief from some various forms . . . ."

The rejection of this "differential diagnosis" language by the Legislature convinces us that the drafters did not intend that chiropractors be authorized to diagnose or rule out the existence of localized non-spinal ailments in areas such as the elbow. In addition, the House rejected the following language which was proposed as an amendment to § 16401:

> [The practice of chiropractic includes:]
> Advising a patient to consult a health professional licensed under another section of this act in the event the patient's condition cannot in whole or in part, be treated under this part. [1977 Journal of the House 1694.]

Similarly in the Senate an amendment was offered and defeated which would have changed the present wording of § 16401(1)(b)(i) to a broader use of diagnosis by omitting the italicized words in the following sentence:

> Diagnosis . . . to determine *the existence of spinal subluxation or misalignments that produce nerve interference indicating* the necessity for chiropractic care. [1978 Journal of the Senate 1422.]

Thus, aside from any asserted competence to diagnose localized ailments in areas such as the elbow or kidney, the Legislature's rejection of these proposed changes indicates an intent that the scope of the practice of chiropractic not include the duty to originally diagnose non-spinal ailments to determine whether they are treatable by chiropractic or whether the treatment should be done by another health-care professional.

Moreover, § 16401(1)(b)(iii) states that practice of chiropractic includes "the use of x-ray machines in the examination of patients for the purpose of

locating spinal subluxations or misaligned verte-
brae of the human spine." Because of our conclu-
sion above that the Legislature rejected the intent
to authorize chiropractors to make differential
diagnosis, this statute must be construed in a
positive sense. That is, x-rays may be used to
locate where subluxations or misalignments are in
the spine, not for the purpose of ruling out local
problems. Also, if there had been an intent to
allow the use of x-ray in areas other than the
spine the Legislature could have so stated rather
than limiting the use to the "purpose of locating
spinal subluxations."

Perhaps to avoid this exact holding, an amend-
ment was offered and voted down in the House
that would have changed § 16401(1)(b)(iii) to read
in part:

> [The practice of chiropractic includes] the use of
> x-ray machines in the examination of patients *as
> generally used in the practice of chiropractic.*
> [1977 Journal of the House 1694.]

The rejection of this broad language in favor of
the more narrow wording restricting the purpose
of x-ray use to the location of spinal subluxations
or misalignments further establishes the legisla-
tive intent that x-rays may only be performed on
the spine.

In addition, we concur in the Attorney General's
argument that the important policy of ensuring
safe treatment of patients is best promoted by this
interpretation. Under appellant's view, there is
the potential that the patient, being told by the
chiropractor that the problem is in his back (not
his elbow), will not seek medical attention. This
delay could lead to unnecessary aggravation of the
localized ailment. This result is best avoided by

having health-care professionals with more extensive training and authority under the licensing statutes make the diagnosis as to the cause of nonspinal maladies.

If the practice of x-raying or diagnosing other parts of the body is ultimately enjoined as a result of this interpretation of the chiropractic discipline, it may make it difficult for the chiropractor to project the effect of treatment on certain bodily symptoms, but it would not interfere with the ability of the chiropractor to locate or treat spinal subluxations or misalignments. In this case, the appellant diagnosed spinal subluxations by the use of x-ray on the investigator's spinal area. This is the type of diagnosis and use of x-ray contemplated by § 16401.

Lastly, it follows from the above analysis that the scope of chiropractic does not include the authority to treat an elbow. The Legislature would not have authorized the treatment of an elbow where it prohibited the x-ray and differential diagnosis of it. A contrary rule would allow the treatment of the elbow where there is no ability to even make a diagnosis as to the ailment being treated. Also, the plain language of § 16401(1)(b)(ii) states that chiropractic practice includes the "adjustment of spinal subluxations or misalignments and related bones and tissues for the establishment of neural integrity . . . ." There is nothing in this wording which shows an intent to authorize the treatment of areas other than the human spine.

In sum, the x-ray, diagnosis, and treatment of an elbow are all outside the statutory definition of chiropractic practice.

### B. Physical Examination

Appellant testified that he tested the investiga-

tor-patient's urine sample for sugar and albumin because the presence of sugar could mean an "abnormality of several organ dysfunctions" and could implicate the "general health picture." Albumin in the urine means "there could be a protein mis-metabolism" which in turn "could show that there's [*sic*] problems with the kidneys."

The appellant testified that he routinely took hair samples to be tested by a laboratory for trace minerals such as cadmium, nickel, and zinc to determine if there was a deficiency or over abundance of minerals. On this basis, appellant would "prescribe proper minerals, vitamins, or enzymes for the correction of the deficiencies or over abundance" of the minerals. Appellant focuses on his own testimony in stressing the importance and necessity of these tests. Urinalysis, when used in conjunction with blood and hair analysis, can provide a concrete picture of what the chemical and biochemical makeup of the patient's body is at the time of examination. Blood analysis indicates those elements circulating in the blood at the time the blood is drawn. He further testified that urinalysis indicates what is being excreted from the body, and hair analysis indicates what is being retained by the body.

On the basis of this record, the trial court enjoined the defendant from "[o]btaining, attempting to obtain, or analyzing urine samples or conducting hair analysis . . . ."

Appellant argues that "[a]ll this information is vitally necessary if the chiropractor is to stabilize any low back ailments and structures from which the patient is complaining, and is extremely important if any kind of nutritional advice is to be given the patient."

Appellant further contends that urinalysis is a necessary procedure because in addition to show-

ing the patient's overall health picture it also helps the chiropractor determine whether it is possible to stabilize a patient's low back condition by means of an adjustment and is an indispensable tool to determine whether or not a patient is susceptible to chiropractic care at all, or whether he must be referred to another health-care provider.

As to the general physical examination, appellant also cites his own testimony as to why he did each of the acts. The blood pressure was taken to determine the presence or absence of high blood pressure. A high blood pressure could indicate immediate danger for the patient and would require a referral to a medical doctor. It could also indicate that the patient should not undergo chiropractic care. Appellant also indicated that high blood pressure could be somehow related to the spine.

Appellant examined the investigator's heart because he claimed a spinal subluxation could possibly produce nerve interference which in turn could produce a reaction in the heart. The nerves that go to the heart, according to appellant's testimony, come from the spinal column and thereby create the possibility that an irritation within the spinal column could affect the electrical impulses to the heart.

The investigator's lungs were examined as part of the determination of the patient's overall health. If problems were found in the lungs, the patient would be referred to a medical doctor.

Appellant testified that he examined the investigator's eyes to determine if any problems were present and to determine whether there was occular nerve involvement. If problems with the eyes were found the patient would be referred to another doctor.

The investigator's throat and mouth were examined to determine the overall health picture. If the patient had dentures they would have to be removed before x-rays could be taken. Missing teeth could indicate a vitamin or mineral deficiency.

On the basis of this record, the trial court enjoined the defendant from "[p]erforming a physical examination which includes eyes, ears, nose, throat, lungs or abdomen, or employing blood pressure, pulse, urine sample, tongue depressor or stethoscope in the course of said examination . . . ."

If chiropractors are authorized to provide certain types of health care to their patients, then, appellant argues, they must at a minimum be allowed to use those basic diagnostic tests necessary to determine whether and to what extent the patient requires chiropractic care. For example, as appellant testified, it would be extremely difficult, if not impossible, to give nutritional advice to a patient without urine testing. It would be "extremely dangerous" to prescribe any type of exercise regimen for a patient without knowing whether the patient is diabetic. Moreover, he argues, sometimes it is not even possible to discover whether low back pain is spinally caused or kidney related without the use of such testing.

The Attorney General argues that the collection and interpretation of laboratory specimens is outside the scope of chiropractic. He cites *Attorney General v Recorder's Court Judge,* 92 Mich App 42; 285 NW2d 53 (1979), *lv den* 407 Mich 955 (1980). In that case, occurring under the pre-1978 statute, the chiropractor had taken "throat cultures and urine samples for analytical purposes." *Id.,* p 55. The appellant there contended "that he had a duty to ascertain whether a patient's ailments were of a type to which chiropractic might

be applied, and that the use of such diagnostic techniques was necessary for making such a determination." *Id.*, pp 55-56.

The scope of the practice of chiropractic was defined at that time as:

> The license provided for in this act shall entitle the holder thereof to practice chiropractic in the state of Michigan, and for the purpose of this act chiropractic is defined as "the locating of misaligned or displaced vertebrae of the human spine, the procedure preparatory to and the adjustment by hand of such misaligned or displaced vertebrae and surrounding bones or tissues, for the restoration and maintenance of health." A licensed doctor of chiropractic under this act may use x-ray and such analytical instruments as are approved by the Michigan board of chiropractic examiners in the examination of patients solely for the purpose of locating misaligned or displaced vertebrae of the human spine and for the procedures preparatory thereto. [MCL 338.156; MSA 14.596.]

The Court of Appeals in that case rejected the chiropractor's arguments and held:

> While analysis of human specimens may reveal the existence of organic problems untreatable by chiropractic, this is true of all diagnostic tests used by members of the medical profession. We do not believe the Legislature intended to authorize chiropractors to engage in general diagnostic techniques. Had such a result been intended, it could have been clearly stated, as was done with respect to the use of x-rays. Rather than authorizing general diagnostic techniques, the statute limited chiropractors to those methods which might reveal the existence of misaligned or displaced vertebrae.
>
> We fail to see how taking urine samples or throat cultures will reveal the existence of subluxations. Hence, we conclude that such activities

were outside the scope of a chiropractor's author-ity. [92 Mich App 56.]

The appellee also cites *Cotter v Blue Cross,* *supra,* involving interpretation of the same statute as in *Recorder's Court Judge, supra.* As previously noted in *Cotter,* p 133, Blue Cross had sent notices to all subscribers saying that "[d]iagnostic labora-tory services ordered and/or performed by a chiro-practor" would be excluded from coverage. The Court of Appeals affirmed the trial court's grant of summary judgment in favor of Blue Cross, ruling that laboratory services were outside the scope of chiropractic.

Appellee also cites MCL 333.20507; MSA 14.15(20507) and 1979 AC, R 325.2351, as support for his contention that chiropractors may not col-lect or interpret laboratory specimens.

MCL 333.20507; MSA 14.15(20507) provides in part:

> Sections 20501 to 20525 [various licensing re-quirements for laboratories] do not apply to any of the following:
>
> *   *   *
>
> (b) A laboratory operated by an individual li-censed to practice medicine, osteopathic medicine and surgery, dentistry, or podiatry who performs clinical laboratory tests or procedures personally or through his or her employees only as an ad-junct to the treatment of the licensee's patients.

1979 AC, R 325.2351 provides in part: "A labora-tory may examine specimens at the request of a physician, dentist or other person authorized by law to receive such results."

Thus, according to the appellee, the absence of the term "chiropractor" in these provisions indi-cates that the Legislature could not have envi-

sioned the utilization of laboratory testing in chiropractic.

Finally, appellee argues that by representing himself as competent to rule out or detect non-spinal ailments by using a complete physical examination, appellant is engaging in "differential diagnosis." Appellee also sets forth substitute House Bill 6306, § 16401(1)(b) discussed above in conjunction with the elbow treatment issue.

The Attorney General concludes that the Legislature, therefore, rejected the inclusion of differential diagnosis and physical examinations within the scope of chiropractic, opting instead for chiropractors to diagnose only to determine the need for chiropractic care rather than allowing them to rule out the need for medical care from any other health-care provider.

The hearing officer found these practices outside the scope of chiropractic on the basis of the authority of the Court of Appeals holding in *Recorder's Court Judge, supra,* and the legislative rejection of differential diagnosis. He also found nothing in the chiropractic statutes authorizing these practices.

The board differed with the hearing officer, finding that urine analysis is helpful in "whether there is nerve interference which affects the functioning of the kidneys" and is "useful in giving nutritional advice" and, in respect to hair analysis, that "the analysis of the chemical makeup of hair is a recognized tool in assessing the nutritional state of a person."

The board also opined that they saw no reason "why a chiropractor cannot use such basic instruments as a sphygmomanometer, stethoscope, and tongue depressor in gathering data concerning the general physical condition of a patient." This is within the scope of chiropractic "as long as the

purpose is not to specifically diagnose conditions not amenable to chiropractic care."

They found it was "entirely appropriate" for chiropractors "to gather data which may be used to determine whether or not chiropractic treatment is indicated, and if so, the specific nature of nerve interference." The board was "supportive of the concept of differential diagnosis in the sense that it means deciding whether or not chiropractic care is called for."

They also adopted the appellant's argument that "it would be potentially dangerous to employ certain rehabilitative exercises without knowing such basic information as pulse rate and blood pressure."

The trial court found the collection and analysis of laboratory specimens to be outside the scope of chiropractic unless it is necessary to locate a spinal subluxation or misalignment, and its reading of the record found that neither hair nor urine analysis were "necessary or related to spinal subluxations or misalignments." The court further found that since the chiropractor cannot treat the general health of the patient and the profession is not one of "total patient care" a complete physical examination "goes far, far beyond the statutory guidelines for the practice of chiropractic."

The Court of Appeals, beginning with the observation that under the statute chiropractic diagnosis is for the "limited purpose of determining the existence of spinal subluxations or misalignments that produce nerve interference," held that the reasoning of *Recorder's Court Judge, supra,* was still valid under the current statute. The Court agreed that "information gained from general diagnostic techniques and analysis of human specimens may be important to the safe rendering of chiropractic care," but, nevertheless, it ruled that

"there is nothing in the licensing statute requiring a chiropractor to be trained in evaluating a patient's general physical condition or assessing the health risks involved." 124 Mich App 348-350.

The differences between the conclusion of the board and that of the lower courts are based essentially on the board's willingness to have the scope of chiropractic include differential diagnosis. In its findings on the elbow issue as with this issue of specimen analysis and physical examination, the board disclaims any authority within the chiropractic statute for the treatment of any of the other parts or organs of the non-spinal anatomy; yet, inexplicably, they would accord to chiropractic the authority and, assumedly, the expertise to diagnose other bodily ailments as a means of eliminating the cause of symptoms resulting from other than nerve interference. As expressed in the elbow issue, our assumption from the record and the appellant's own arguments is that spinal subluxations and misalignments can only be located at their source and that the effects of nerve interference in other parts of the body can only be ascertained by the elimination of other causes of the symptoms. We do not see anything in the words of the chiropractic licensing statute "diagnosis . . . to determine the existence of spinal subluxations or misalignments that produce nerve interference" that would suggest it could be read as "diagnosis to determine alternate causes of nerve interference" by the use of physical examination or collection and interpretation of laboratory specimens. In *Kentucky Ass'n of Chiropractors, Inc v Jefferson County Medical Society,* 549 SW2d 817, 819-820 (Ky, 1977), the Kentucky Supreme Court interpreted a statute which stated that "chiropractor means one qualified by experience and training . . . to diagnose his patients and

to treat those of his patients diagnosed as having diseases or disorders relating to subluxations of the articulations of the human spine and its adjacent tissues by indicated adjustment of those subluxations and by applying methods of treatment designed to augment those adjustments . . . ." The court held that there was no evidence in this definition that the drafters intended to authorize chiropractors to submit specimens to laboratories. This statute "does not provide even an inference that such authorization was intended." 549 SW2d 821. We agree with the reasoning used by the Kentucky Supreme Court in interpreting a statute similar as to this issue. The plain words of § 16401 do not evince any legislative intent to license chiropractors to do physical examinations or laboratory tests and indeed the legislative history convincingly shows that the drafters consciously rejected this result.

We find significant, as did the lower courts, the rejection by the Legislature of the principle of differential diagnosis. The rejection of this language along with the other previously mentioned considerations, indicate that a strict interpretation of the word "diagnosis" is most in tune with the lawmaker's intent.

Even more importantly, on June 16, 1977, an amendment was offered in the House which would have changed § 16401(1)(b)(i) to read in part:

> [Practice of chiropractic includes] diagnosis including *physical examination* and spinal analysis to determine the existence of spinal subluxations . . . . [1977 Journal of the House 1694.]

The rejection of the words "physical examination" in the proposed amendment bolsters the conclusion that the Legislature did not intend the per-

forming of physical examinations to be within the scope of chiropractic.

Appellant argues that certain information such as that which can be ascertained from urine specimens and blood pressure tests would be helpful, if not health preserving, in preparation for chiropractic treatment. Even if true, these considerations cannot change the conclusion reached in interpreting a statute that is clearly intended to limit the scope of chiropractic and in which the purpose of a chiropractic "diagnosis" is specifically limited to the determination of existing subluxations or misalignments. By the appellant's own testimony and the board's own findings, it is clear that the purpose of collecting information from obtaining body specimens and doing a physical examination is to diagnose and discover maladies and diseases which are not spinal subluxations or misalignments. This contravenes the plain language of § 16401.

The arguments advanced by the appellant that many of the procedures used, such as physical observation of the mouth and the taking of pulse and blood pressure, were routine and in many cases, amount to no more than home remedies may be more persuasive on remand in determining whether they constitute the practice of medicine.[8] Appellant did not perform these acts individually, but admittedly performed them as part of a comprehensive physical examination. Such an undertaking is outside the scope of chiropractic practice.

### C. Use of Galvanic Current, Diathermy, and Ultrasound

The Court of Appeals upheld the trial court's order enjoining appellant from "[u]tilizing galvanic

---

[8] The appellant points out that blood pressure and pulse rate can be obtained at coin operated machines at public locations.

current, ultrasound or diathermy for the diagnosis or treatment of a patient."

The appellee called a biomedical technician who testified as follows about the operation of these machines. An ultrasound machine produces ultrasonic sound waves which penetrate the body where they dissipate into heat or are monitored in their return from the body. A diathermy machine produces radio waves which penetrate the body (the waves will actually penetrate anything but metal) and generate heat within the body. A pulse diathermy machine is identical except that it will turn the radio waves on and off at millisecond rates. When a galvanic stimulator is used, the patient's body is used as a path for electricity. The machine causes electric currents to flow "all over" the body because the body is used as a path for electricity. An applicator wand and a wetted sponge are used in this procedure.

Only appellant testified to the medical purposes of these devices, stating that galvanic current assists the chiropractor in diagnosis by helping to localize the area of spinal subluxation by searching out "trigger points." He also testified that it is used therapeutically to release "obnoxious trigger points" and reduce irritation in the spinal area, and it serves as a deep massage to produce localized heat and thereby alleviate pain. Pulse diathermy, he stated, is used to release muscle spasms in the lower lumbar area prior to an adjustment to realign the spinal subluxation. He said that the muscles and ligaments are more likely to hold the realigned position if pulse diathermy is used first. He noted that diathermy increases the circulation, blood supply, and nutrition to the affected area, which in turn accelerate the healing rate of the adjusted spine. Lastly, Dr.

Beno stated that the diathermy helps remove from the affected area any "debris" which is present due to accident, injury, or strain to the area, and that these machines "greatly complement[ ] the manipulation [and], help[ ] to stabilize the manipulation at an accelerated rate, compared to what can be done without them."

§ 16401(1)(b) provides in part:

> . . . Practice of chiropractic includes:
> (iii) The use of analytical instruments, nutritional advice, rehabilitative exercise and adjustment apparatus regulated by rules promulgated by the board pursuant to [MCL 333.16423; MSA 14.15(16423)] . . . . The practice of chiropractic does not include the performance of incisive surgical procedures, [or] the performance of an *invasive procedure requiring instrumentation* . . . . [Emphasis added.]

§ 16423 provides:

> (1) The board shall promulgate rules to establish criteria for the approval of analytical instruments and adjustment apparatus to be used for the purpose of examining patients in locating spinal subluxations and misalignments of the human spine. The criteria established shall be substantially equivalent to nationally recognized standards in the profession for the use and operation of the instruments. The board may approve types and makes of analytical instruments that meet these criteria.
> (2) An individual shall not use analytical instruments or adjustment apparatus which does not meet nationally recognized standards or which is not approved by the board.

The Board of Chiropractic has issued rules which became effective January 14, 1982, after the

date of the 1981 trial court decision but before the 1983 Court of Appeals opinion.[9]

1982 AACS, R 338.12001 provides in part:

As used in these rules:

(a) "Adjustment apparatus" means a tool or device used to apply a mechanical force to correct a subluxation or misalignment of the vertebral column or related bones and tissues for the establishment of neural integrity.

(b) "Analytical instruments" means instruments which monitor the body's physiology for the purpose of determining subluxated or misaligned vertebrae or related bones and tissues.

R 338.12010 states:

In accordance with section 16423 of the code, the following criteria are established for adjustment apparatus which the board has been asked to approve:

(a) The purpose of the apparatus is to restore or maintain alignment of vertebrae.

(b) The apparatus applies a mechanical force to the spine or related bones and tissues.

R 338.12011 provides:

In accordance with section 16423 of the code, the following criterion is established for analytical instruments which the board has been asked to approve:

The purpose of the instrument is to monitor the body's physiology for the purpose of determining subluxated or misaligned vertebrae or related bones and tissues.

[9] The circuit court injunction was issued November 19, 1981, the claim of appeal was filed on December 8, 1981, the Chiropractic Board rules were effective January 14, 1982, and the Court of Appeals opinion was issued March 21, 1983.

The hearing officer held that the Legislature intended a "very wide meaning" of the prohibition of the use of an "invasive procedure requiring instrumentation . . ." and concluded that the use of these devices represented an invasion of electronic agents and, therefore, were precluded under chiropractic practice. He also concluded that the use of these machines represented the practice of physical therapy under MCL 333.17801; MSA 14.15(17801).

The board (prior to the issuance of their regulations on this subject) concluded that "the use of these modes for *therapeutic* purposes is outside the scope of chiropractic." (Emphasis added.) The board did, however, find that galvanic current was an appropriate chiropractic *diagnostic* technique. The board disagreed with the hearing officer and opined that the use of these devices does not result in an invasive procedure.

The trial court found that all are excluded from the scope of chiropractic because they involve "entrance into the body of sound waves, electric current or heat." Accordingly, the court held that they are invasive procedures requiring instrumentation and expressly excluded under MCL 333.16401(1)(b)(iii); MSA 14.15(16401)(1)(b)(iii). Further, it held that they are inconsistent with the chiropractic healing philosophy of using the inherent recuperative powers of the body for restoration and maintenance of health.

The Court of Appeals did not decide whether these practices are invasive. It held that the activities are included in the practice of physical therapy and that a person is not permitted to engage in the practice of physical therapy unless so licensed or otherwise authorized by the act. See MCL 333.17801; MSA 14.15(17801). Since chiropractors are not given an express authorization to

perform these procedures, as are physical thera-
pists, the Court found that such procedures are
outside the practice of chiropractic and are prohib-
ited.

This analysis only partially resolves this issue
since appellant is arguing that chiropractors are
otherwise authorized by law to engage in these
practices. We must decide whether these tech-
niques are allowed under the chiropractic act, not
under the statutory provisions dealing with physi-
cal therapy. Merely because these activities may
constitute the practice of physical therapy, or for
that matter the practice of medicine, nursing, etc.,
does not thereby inevitably mean that they are not
within the scope of chiropractic. An examination
of the licensing jurisdiction of the various health-
care professions reveals considerable overlapping
among them. It is possible that some of the activ-
ity which is included within the broad definition of
the practice of medicine is also included within not
only chiropractic but also, for example, physical
therapy, podiatry, and dentistry. Thus, when ana-
lyzing whether a particular activity is within an
individual health-care profession, the focus should
be on the statutory definition of that profession,
and not whether the activity is included within
other professions. We therefore do not find the
physical therapy statute to be determinative of the
issue of the use of these three devices.

We agree with the Court of Appeals that there
is no express authorization for the use of these
machines within the chiropractic act. Appellant
nevertheless maintains that the use of these de-
vices is impliedly authorized by statute, specifically
by the word "rehabilitative exercise," and subse-
quent board rules. Specifically he points to Board
of Chiropractic rule 1982 AACS, R 338.12001(d)
which provides:

"Rehabilitative exercises" means the coordina-
tion of a patient's exercise program, the perfor-
mance of tests and measurements, instruction and
consultation, supervision of personnel, and the use
of *exercise and rehabilitative procedures, with or
without assistive devices, for the purpose of cor-
recting or preventing* a subluxated or misaligned
vertebrae of the vertebral column. [Emphasis
added.]

He contends that since the emphasized language of
the board rule is identical to that contained in the
statutory definition of the practice of physical
therapy, MCL 333.17801(1)(b); MSA
14.15(17801)(1)(b), the board must have intended to
authorize the use of the devices by chiropractors.

The interpretation of 1982 AACS, R 338.12001(d)
urged by appellant was expressly rejected by the
board when it ruled in this case that the therapeu-
tic use of these devices is outside the scope of
chiropractic. It is not likely the board would have
intended to allow the use of these machines by its
regulation when it had earlier ruled that their use
is not within chiropractic.

It is undisputed that these machines are used
for treatment or therapeutic purposes and not for
rehabilitative exercise. During their use, according
to appellant's testimony, the patient lies still and
receives the sound, radio, or electric waves into
the treated area. This is not exercise within the
meaning of § 16401. We cannot stretch the words
"rehabilitative exercise" to include a situation
where the patient passively receives treatment.
This is confirmed by the board's definition which
speaks of the "patient's exercise program." Even if
we agreed with the appellant's interpretation of
the board rule, these therapeutic procedures would
still not be within the scope of chiropractic. Obvi-
ously, the board cannot, by regulation, turn a

treatment procedure into an exercise program merely by labeling it so. Whatever definitions or regulations the board makes must fit within the plain meaning of the terms of the authorizing statute. The board has correctly interpreted the words "rehabilitative exercises" to mean a patient's exercise program and not the use of these machines for therapeutic purposes.

Aside from any action by the board, there is no implied authorization for the use of these devices in § 16401. The primary purpose as shown by appellant's own testimony is for treatment of the spine to help relieve or correct subluxations or misalignments. The authority of chiropractors to treat or attempt to cure spinal problems is delineated in § 16401(1)(b)(ii) which provides:

[The practice of chiropractic includes] [t]he adjustment of spinal subluxations or misalignments and related bones and tissues for the establishment of neural integrity utilizing the inherent recuperative powers of the body for restoration and maintenance of health.

This language contains no suggestion that the Legislature intended to permit the use of these devices. In fact, the wording contemplates that the healing process will utilize "the inherent recuperative powers of the body." This strongly suggests that the use of sound waves, radio waves, and electrical currents as advocated here was not intended to be allowed since these techniques introduce external stimuli into the human body rather than using the body's own recuperative powers. Moreover, the statute states that "adjustment" of spinal subluxations or misalignments is allowed, and there is nothing to indicate that the adjustment of the spine was intended to include the use

of sound waves, electricity, and radio waves to affect parts of the body other than the spine itself. Indeed, appellant does not contend that the use of these machines constitutes the adjustment of the spine.

Further support for our conclusion exists in the board regulation defining "adjustment apparatus," 1982 AACS, R 338.12001(a), which states:

> "Adjustment apparatus" means a tool or device used to apply a mechanical force to correct a subluxation or misalignment of the vertebral column or related bones and tissues for the establishment of neural integrity.

The record in this case is clear that the electrical currents, radio waves, and sound waves produced by the machines at issue here do not "apply a mechanical force" to the spinal area. Rather these devices are designed to produce high frequency waves which penetrate the body and create heat when the waves are resisted by human cells. This is not a "mechanical force" and we conclude, as did each tribunal below, that the use of these machines for the treatment or relief of human ailments is outside the scope of chiropractic.

There still remains the question whether the use of a galvanic stimulator as an analytical, or diagnostic as opposed to treatment, device is permissible. With regard to the authority of chiropractors to diagnose ailments, § 16401(1)(b)(i) allows the profession to do

> [d]iagnosis, including spinal analysis, to determine the existence of spinal subluxations or misalignments that produce nerve interference, indicating the necessity for chiropractic care.

The use of analytical instruments regulated by

board rules is also allowed. 1982 AACS, R
338.12001(b) provides:

> "Analytical instruments" means instruments
> which monitor the body's physiology for the pur-
> pose of determining subluxated or misaligned
> vertebrae or related bones and tissues.

Appellant testified that he used galvanic current
as a diagnostic tool by searching out "trigger
points" in the spinal area which in turn helped to
locate subluxations. The appellee and lower courts
have not presented persuasive reasons why the use
of the galvanic stimulator is outside the scope of
chiropractic. When used as appellant described,
this device obviously fits within the board defini-
tion of "analytical instrument." The trial court
held that the use of this device is an invasive
procedure expressly prohibited by § 16401(1)(b)(iii)
and that it thus did not determine that it would be
allowed as an analytical instrument.

On this record, we do not agree with the trial
court that the evidence showed that the use of this
machine constitutes an invasive procedure. As
noted above, the appellee called a biomedical tech-
nician who testified as to the operation of the
galvanic stimulator.[10] At no point did the witness
testify that in the general use of this machine
currents "invade" the body within the meaning of

---

[10] We emphasize again that the evidence in this case established
that appellant used the galvanic stimulator as an "analytical instru-
ment" to assist in his diagnosis of the investigator's subluxations.
Appellant does not contend that the therapeutic use of this or the
other devices at issue is permissible under the board definition of
analytical instrument. Indeed, as discussed above in conjunction with
the rehabilitative exercise regulation, the board cannot allow the use
of such machine for treatment purposes under its authority to make
rules for analytical instruments. The unambiguous wording of the
statutory language contemplates rules for use of instruments in
analysis not treatment.

§ 16401.[11] Indeed the testimony is unclear as to whether the currents enter the body at all. Nor was any evidence presented that the method in fact used by appellant in this case was an "invasive procedure."

The Court of Appeals holding that there is no express authorization for the use of this machine as it would apply to diagnosis is not justified on this record. On remand to the trial court the determination should be made, after establishing a better record, whether the use of the machine results in an invasive procedure and, if not, whether its use is permitted as an analytical in-

---

[11] The testimony of this witness as to this device is here set forth in its entirety:

"*Q.* You indicated you were familiar with a galvanic stimulator, is that correct?

"*A.* Yes.

"*Q.* What is that machine?

"*A.* The machines that we have that we call galvanic stimulators are an electrical generator that generate either at DC voltage potential or AC voltage potential or both and the application is through again, wands or wetted sponge pads.

"*Q.* What does a wetted sponge pad look like?

"*A.* Anywhere from two inches square to four inches square is common, and it's set in a rubber holder and the wire from the machine contacts a metal plated holder and contacts the back of the sponge.

"*Q.* When applied to the body, what happens?

"*A.* Electric currents are caused to flow, since you're introducing the patient as a path for the electricity. The current—that's it.

"*Q.* Currents will flow?

"*A.* Yes.

"*Q.* Through the body?

"*A.* All over.

"*Q.* How does that happen? Is the body a conductor? What is the principle?

"*A.* You can view the body as one large bag of saline, salt water, and it being such, it's very useful for propagating electricity. Your heart will generate on an electrical signal. These electrical signals are found *on all parts of the body* on the *outside of the body.* The converse itself is also true if you produce a signal on the outside of the body, it will be found *within the body.*

"*Q.* Is it true whether you use the wand or the pads?

"*A.* Yes, any time you cause a current to flow."

strument for diagnostic purposes.[12] Also, as on each of the other practices complained of here, the court shall determine whether this activity constitutes the practice of medicine without a license or some other violation of article 15, so as to justify injunctive relief. MCL 333.16291(1); MSA 14.15(16291)(1).

### D. Execution of Pre-employment Physical Document

The defendant signed a document entitled "Employee Health Record" for the investigator-patient; filled in the blood pressure reading and checked boxes indicating "normal" for head, eyes, ears, nose-throat, neck, skin, chest-lungs, heart, breast, abdomen, extremities, reflexes, back; and "approved for employment"—with the word "yes." It was signed "J. J. Beno, D.C."

The trial court enjoined the "executing [of] a pre-employment physical record without identifying himself as a chiropractor or D.C., or certifying or attempting to certify the general condition of anything other than the spinal column."

On this issue the parties follow their arguments advanced on the issue of the general physical examination. The appellant considers the form "quite simple in nature" and indicates that the testimony shows that his training and experience renders him competent to conduct an examination. The Attorney General relies on his earlier arguments that patients will be misled to their possible detriment if a chiropractor not only does a physical examination, but creates the same risks for an

---

[12] Since we have determined that the use of the other devices for treatment purposes is outside the scope of chiropractic, we do not pass upon the adequacy of this testimony as establishing that their operation is an invasive procedure.

employer who relies on the information in the form.

The hearing officer, in finding the execution of the document to be within the scope of chiropractic, stated:

> There would appear to be a reasonable difference between a pre-employment physical which all too often is done very routinely and a complete physical examination whose purpose is to utilize the results thereof in development of a treatment plan going beyond the existence and treatment of spinal subluxations or misalignments.

The board agreed with the hearing officer that chiropractors can sign such a form "as long as no diagnosis is made of or for treatment of conditions not amenable to chiropractic."

The trial court, in support of its injunction, held that because chiropractors are not authorized to engage in differential diagnosis and may not hold themselves out as able to do so, a chiropractor could only execute such a form "indicating the general condition of the spinal column . . . ."

In keeping with its findings on the issue of the general physical examination, the Court of Appeals upheld the judgment of the trial court.

On the basis of our analysis relating to the giving of a physical examination, we find it equally persuasive that there is nothing in the chiropractic licensing statute which would indicate that it is intended to be within the scope of that discipline to make a determination of the condition of the general anatomy and perforce to certify or represent the state of a patient's general health. We, therefore, find that the diagnosis of a patient's general health by means of a complete examination as was done here is outside the scope of chiropractic.

### E. Sale or Prescription of Vitamins

As a result of appellant's "prescribing"[13] and selling to the patient-investigator a dietary supplement containing vitamins and minerals in order to rebuild back ligaments, the trial court enjoined the "[s]elling, dispensing, or prescribing vitamins to a patient . . . ."

§ 16401 as it pertains to this issue states that the

> [p]ractice of chiropractic includes . . . (iii) [t]he use of analytical instruments, *nutritional advice,* rehabilitative exercise and adjustment apparatus . . . . The practice of chiropractic does not include . . . the dispensing or prescribing of drugs or medicines.

The hearing officer, on the basis of the testimony of the Executive Secretary of the Michigan Pharmacy Board, who testified that Nuclix was a dietary supplement or food product and not subject to the pharmacy or drug laws, held that the Attorney General had not met the burden of proving Nuclix was a prohibited drug. Since chiropractors may use nutritional advice, he concluded that the appellant was operating within the chiropractic statute. The board found it unnecessary to decide whether the appellant's action was within chiropractic, in view of the fact that it was an over-the-counter product and "not subject to any restriction by any government agency." The trial court relied

---

[13] Section 17708(3) defines a prescription as

"an order for drugs or devices written and signed or transmitted by other means of communication by a prescriber to be filled, compounded, or dispensed. Prescribing shall be limited to a prescriber."

While it is unnecessary for our purposes in the instant case to define a prescriber or a prescription, we think it is questionable whether Dr. Beno was "prescribing" when he sold Nuclix to the investigator-patient.

on *Attorney General v Recorder's Court Judge,
supra,* where the defendant chiropractor had given
"various non-prescription medicines for colds,
headaches, pain, and nasal congestion, and topical
medicine for rash and a scrape on the arm." The
Court of Appeals stated:

> In *State v Wilson,* 11 Wash App 916; 528 P2d
> 279 (1974), the Washington Supreme Court ruled
> that chiropractors may not give or prescribe min-
> erals, vitamins or food supplements. The Court
> noted that while these items are available without
> prescription in retail stores they may, neverthe-
> less, be dangerous when improperly used.
>
> We agree with this analysis and conclude that
> the Michigan Legislature did not intend that chi-
> ropractors use any medicine given internally or
> externally for the treatment of disease or other
> human ailment.

The trial court believed that this holding was
"unchanged" by the new Public Health Code
which added the words "nutritional advice."[14]

The Court of Appeals in a split decision held
that the inclusion of the provision on nutritional
advice does not address the use of vitamins and
food supplements and, like the trial court, relied
on the rationale of *Recorder's Court Judge.*

Noting the unique relationship between a
health-care provider and the patient, it took "judi-
cial notice of the potential danger involved" when

---

[14] Shortly after the issuance of *State v Wilson, supra,* the Washing-
ton Legislature amended their chiropractic statute to read:

"[N]othing herein shall be construed to prohibit the rendering of
dietary advice." Wash Rev Code Ann, § 18.25.005.

In *Stockwell v Washington State Chiropractic Disciplinary Bd,* 28
Wash App 295, 300; 622 P2d 910 (1981), the Washington Court of
Appeals upheld as not inconsistent with that amendment an adminis-
trative regulation that prohibited the "selling or dispensing vitamins
and food supplements."

the substance is misused, even though it is not a drug. 124 Mich App 353.

Judge DANHOF dissented on this issue and would have held the dispensation of this supplement to be within chiropractic. He noted the unregulated status of this substance and that under the new Health Code, including nutritional advice is included under the scope of chiropractic.

Appellee contends that the legislative exclusion from chiropractic of the dispensing or prescribing of drugs or medicine covers the appellant's action here. He cites MCL 333.17703; MSA 14.15(17703) which defines drugs as:

> (4)(a) A substance recognized or for which the standards or specifications are prescribed in the official compendium.
>
> (b) A substance intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in human beings or other animals.

Because Dr. Beno prescribed Nuclix to help strengthen the back ligaments, appellee contends the substance was intended for the "cure, mitigation, [and] treatment" of a disease and therefore is a drug under the act.

The appellee also cites the prevailing authority which strictly construes similar statutes, see *Norville v Mississippi*, 364 So 2d 1084 (1978), and *Stockwell v Washington State Chiropractic Disciplinary Bd*, 28 Wash App 295; 622 P2d 910 (1981).

Appellee explains away the inclusion of nutritional advice by concluding that it only refers to the recommending of foods and vitamins for a well-balanced diet and that there is a difference between recommending nutrition and prescribing substances to cure a particular ailment.

We cannot so lightly dismiss the effect of the

inclusion within chiropractic of "the use of . . .
nutritional advice . . . ." The words "nutritional
advice" standing alone refer to the promotion and
maintenance of overall good health as opposed to
its "use" in curing disease or body malfunctions.
We think, however, the authorization of the use of
nutritional advice within the practice of chiroprac-
tic denotes that the recommendation or dispensing
of a vitamin or food supplement can, at the very
least, be employed as part of a program to correct
a subluxation or misalignment of the spine. This
interpretation is consistent with the evident legis-
lative intent, when, as here, the use of nutritional
advice is authorized in the same sentence as the
use of analytical instruments, rehabilitative exer-
cise, and adjustment apparatus, all of which con-
cern the diagnosis or correction of spinal ailments.
This holding, however, still leaves operative the
exclusion of the use of drugs and medicine by
chiropractors as defined in § 17703(4)(a).

## IV

### CONCLUSION

We concur with the findings of the Court of
Appeals to the effect that the diagnosis and x-ray
of the elbow, the giving of a physical examination,
including the taking of hair and urine samples,
the use of galvanic current, diathermy, and ultra-
sound devices for therapeutic purposes, and the
execution of an employment health document are
outside the scope of chiropractic.

We do not concur with the Court of Appeals
majority on the question of the dispensing of the
vitamin Nuclix; rather, we find that practice to be
within the "nutritional advice" aspect of chiro-
practic, when, as here, a non-drug and non-medi-

cine substance is dispensed to help alleviate spinal subluxations or misalignments.

We decline to rule on the applicability of the statute to the use of galvanic current for diagnostic purposes, and also decline to interpret the application of the "invasive procedures" clause to that device without a more fully developed record on that issue.

Finally, we conclude that engaging in practices outside of the scope of chiropractic does not, on that fact alone, make those practices enjoinable. For that reason, we remand the case to the trial court to afford the plaintiff the opportunity to establish that those practices engaged in by the defendant that we find to be outside the scope of chiropractic or that may upon further finding be determined to be outside the scope of chiropractic are within the practice of medicine and therefore enjoinable as an unlicensed practice of that discipline. This remand will also include the need for further findings in regard to the use of galvanic current for diagnostic purposes.

The judgment of the Court of Appeals is reversed to the extent that it is inconsistent herewith, and the permanent injunction of the circuit court is continued for thirty days to allow the plaintiff to seek a temporary injunction pending the determination of those matters remanded to the circuit court.

We do not retain jurisdiction.

LEVIN, RYAN, CAVANAGH, and BOYLE, JJ., concurred with BRICKLEY, J.

WILLIAMS, C.J. (*concurring*). While I concur generally with my brother BRICKLEY's opinion, I write separately to stress that our holding today does not limit the practice of chiropractic solely to

those practices enumerated in the chiropractic statute, but to these enumerated practices and all other practices not declared to be within the exclusive jurisdiction of a different healing art or a practice totally prohibited to anyone.

It is my understanding of the Michigan philosophy with respect to the practice of the healing arts that there is room for health-care professionals with a wide range of skills and doctrines to coexist so long as they do not infringe upon the exclusive statutory authority of any other group or indulge in practices the Legislature has prohibited because experience has indicated such practices are not in the interests of health or the public.

That some of the healing arts are limited to some professionals is a matter exquisitely within the jurisdiction of the Legislature. As the practice of the healing arts in Michigan reveals, the Legislature has moved with the progress of science and learning and with the progress in the qualifications of the various professional groups to expand or limit the areas of practice as appropriate. The only function of the courts in this area is to interpret and declare the legislative will.

RILEY, J., took no part in the decision of this case.